**Arout MELKONIAN, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 01–71231.

United States Court of Appeals, Ninth Circuit.

Submitted Sept. 9, 2002.*

Filed March 4, 2003.

---

* The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

1062

Eva Garcia–Mendoza and Luther M. Snavely, Las Vegas, NV, for the petitioner.

Mark C. Walters, Greg D. Mack, and Frances Fraser, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: SCHROEDER, Chief Judge, W. FLETCHER, Circuit Judge, and WEINER,** District Judge.

WILLIAM A. FLETCHER, Circuit Judge.

Petitioner Arout Melkonian ("Melkonian"), an ethnic Armenian and a Christian, lived in Abkhazia, an autonomous region within Georgia, from his birth in 1959 until September of 1992, when he fled across the Russian border to escape kidnaping by ethnic-Abkhaz Separatists. He subsequently left Russia and, in early 1994, entered the United States illegally and applied for asylum and withholding of deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1253(h) (1994). The Immigration Judge ("IJ") denied his application, and the Board of Immigration Appeals ("BIA") affirmed. Melkonian timely appealed.[1]

## I. Governing Law and Standard of Review

■ To establish eligibility for asylum, an applicant must demonstrate his or her status as a refugee. *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997). A refugee is an alien who is unable or unwilling to return to the country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, *or political opinion.*" 8 U.S.C. § 1101(a)(42)(A) (1994).

■ Eligibility for asylum based on a well-founded fear of future persecution requires an applicant to satisfy both a sub-

---

** The Honorable Charles R. Weiner, Senior District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Because Melkonian was placed in deportation proceedings before April 1, 1997, and his final order of deportation was issued by the BIA after October 31, 1996, the transitional rules for judicial review of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") apply. *See Kalaw v. INS*, 133 F.3d 1147, 1149–50 (9th Cir.1997).

jective and an objective test. *Singh v. INS*, 134 F.3d 962, 966 (9th Cir.1998). Applicants satisfy the subjective test by credibly testifying that they genuinely fear persecution by their government, or forces their government is unable or unwilling to control, on account of a statutorily-protected ground. *Id.* The objective component is satisfied where credible, direct, and specific evidence in the record supports a reasonable fear of persecution. *Id.*

 We review factual findings of the IJ and BIA under the "substantial evidence" standard. *Singh v. Ilchert (Singh I)*, 63 F.3d 1501, 1506 (9th Cir.1995). That is, we must sustain factual findings if supported by reasonable, substantial, and probative evidence in the record. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We review questions of law regarding the INA de novo, but give deference to the BIA's interpretation of the statute. *Ladha v. INS*, 215 F.3d 889, 896(9th Cir.2000). The BIA must, however, follow the decisions of our court, and we will not defer to BIA decisions that conflict with circuit precedent. *Id.* To the extent that the BIA adopted the findings of the IJ as its own, we treat the decision of the IJ as that of the BIA. *Gonzalez v. INS*, 82 F.3d 903, 907(9th Cir.1996).

## II. Background

Abkhazia enjoyed full republic status within the Soviet Union until February 1931, when it was incorporated into Georgia as an "autonomous republic." During the Soviet era, Abkhazia was home to ethnic Abkhaz, a Turkic speaking, predominantly Muslim people, along with a large number of ethnic Georgians, Armenians, Russians, and Greeks.

After Georgia achieved independence from the Soviet Union in 1991, ethnic tension in Abkhazia increased. Demands by ethnic Abkhaz for greater autonomy led to armed combat between the Georgian National Guard and Abkhaz Separatists ("the Separatists") in August of 1992. Intense fighting continued until September of 1993, when the Separatists succeeded in driving out the Georgian forces and in achieving de facto independence.

Since gaining control, the Separatists have engaged in a campaign of ethnic cleansing in Abkhazia. *See* Comms. on Foreign Relations and Int'l Relations, 104th Cong., 1st Sess., Country Reports on Human Rights Practices for 1994, at 815 (Joint Comm. Print 1995) [hereinafter Country Reports on Human Rights Practices for 1994]. Their main target has been ethnic Georgians, but all non-Abkhaz have suffered. *See id.* It was reported in 1992 that the Separatists moved through captured towns with prepared lists and addresses of ethnic Georgians, plundered and burned homes, and executed designated civilians. *See* Comms. on Foreign Relations and Int'l Relations, 103d Cong., 1st Sess., Country Reports on Human Rights Practices for 1992, at 778 (Joint Comm. Print 1993). The Separatists are credibly reported to have tortured, raped, killed, expelled, and imprisoned hundreds of Georgians and other non-Abkhaz. *See* Country Reports on Human Rights Practices for 1994, at 815.

By the end of 1993, the Abkhaz reign of terror had produced dramatic results. Virtually the entire Georgian population of Abkhazia had fled the region, along with most of the rest of the non-Abkhaz population (approximately 250,000 people). *See* Comms. on Foreign Relations and Int'l Relations, 103d Cong., 2d Sess., Country Reports on Human Rights Practices for 1993, at 881 (Joint Comm. Print 1994). The State Department reported that those fleeing Abkhazia made highly credible claims of atrocities, including the killing of civilians without regard to age or sex. *See*

*id.* Corpses recovered from Abkhaz-held territory showed signs of extensive torture. *See id.* The conflict between the Abkhaz Separatists, who continue to control the region, and the Georgian government remains unresolved today.

Both Melkonian and his wife testified at the hearing before the IJ. Melkonian also offered a written declaration in support of his application for asylum. Neither the IJ nor the BIA questioned the credibility of Melkonian or his wife. We therefore accept their testimony as true. *Prasad v. INS,* 101 F.3d 614, 616 (9th Cir.1996). It reveals the following.

Before hostilities between Abkhaz Separatists and the Georgian military intensified in August of 1992, Melkonian was living in Gagra, Abkhazia, with his wife, Angela (also an Armenian Christian), their eleven-year-old son, Gegam, and Angela's parents. They had a home, a large farm and farmhouse, and a herd of cattle. Life had been relatively calm during the Soviet era, but when the Soviet Union began to disintegrate, living in Abkhazia became difficult. Ethnic groups began to fight amongst each other, particularly the Muslim Abkhaz and Christian Georgians. As Christian Armenians, Melkonian's family felt bound to side with the Georgians. Melkonian's family demonstrated its loyalty by supplying the Georgian fighters with fruit and with money for weapons.

In the early summer of 1992, Abkhaz fighters descended from the mountains and took control of Gagra. Initially, Melkonian could protect his family simply by giving the Separatists money. Then, when fighting broke out with Georgian troops, the Separatists began to round up Armenian men to fight on the front lines. Melkonian testified that the Separatists would grab young men off the street and take them to the front. He explained that the "Muslims would come in the middle of the night and take the Armenian men at gunpoint." Neighbors and friends he had gone to school with were taken to war and never returned. Angela, Melkonian's wife, testified that the Separatists "were beating Armenians up, threatening them and holding them in fear."

Melkonian's father-in-law, whom Angela described as the head of the family, openly refused to fight for the Abkhaz cause. One day in September 1992 he spoke out against the Muslim tactics and in favor of Christianity. That night, a group of armed Separatists came to Melkonian's house with shotguns, demanding to see Melkonian and his father-in-law. Angela and her mother were able to convince them that the men were not at home. Immediately thereafter, Melkonian and his father-in-law fled to Russia. Angela, Gegam, and Angela's mother stayed behind to protect their property.

Melkonian hoped things would normalize soon so that he could return home. He explained at the hearing: "We had our farm, we had our house, we had everything." But the situation in Gagra got worse. The Separatists returned to Melkonian's home demanding to know where he and his father-in-law were. This time, Angela and her mother convinced them that the men had only gone across the border to Russia for supplies, and would return.

The Separatists continued to pursue Melkonian and his father-in-law, repeatedly breaking into their house at night to search for the men. They stole all of the family's meat and cheese and violently beat Melkonian's cheese maker. They took all of Melkonian's cows and murdered an elderly woman who was trying to protect his herd. They took the family's possessions, including the washing machine, the couch, and the doors, shot the windows and ceiling, and then burned Melkonian's farmhouse and farm. The Separatists

placed a man in a car trunk to die, mistaking him for Angela's father.

After an Armenian mother and daughter were burned to death in a home not far from Melkonian's, Angela and Gegam decided that they risked death if they remained in Abkhazia. They crossed over the Russian border and reunited with Melkonian in December 1992. In Russia, the family was safe from the violence of the Separatists, but Melkonian was unable to work without registration. Obtaining registration required knowing someone who could be bribed, and Melkonian knew no one.

In order to survive, Melkonian and Angela got divorced, and Angela married a Russian man with two children. This allowed her to obtain registration, and ultimately two B–2 Visitor's Visas. In November 1993, Angela and Gegam left for the United States; both have been granted asylum. Just fifteen days before her departure, Angela divorced her Russian husband and remarried Melkonian. Melkonian was forced to stay in Russia for an additional several months, however, until he was able to purchase travel documents which allowed him to fly to the United States. He arrived in early 1994.

Melkonian believes that if he were sent back to Abkhazia he would be killed by Abkhaz Muslims. They would kill him immediately, he believes, because he supported the Georgians and because he is an ethnic Armenian and a Christian.

### III. Analysis of the Decision Below

The IJ concluded that Melkonian did not possess a well-founded fear of persecution in Georgia based on race, religion, nationality, membership in a particular social group, or political opinion, as required by § 208(a) of the INA. The IJ's order sug-

gests that he denied Melkonian's application on one of three alternative grounds: (1) Melkonian's reasons for leaving Abkhazia—which the IJ identified as a desire in part to avoid military service with the Muslim Abkhaz army and, in part, to improve himself and his family economically—do not support a grant of asylum; (2) Melkonian does not qualify for asylum because he could have relocated to a non-Abkhaz region of Georgia without incurring racial, religious, national, social, or political persecution; and (3) Melkonian does not qualify for asylum because he came to the United States in order to better himself and his family economically, when he could have remained in Russia without facing persecution. We consider each ground in turn.

### A

The IJ's first ground for denying Melkonian's asylum application is neither supported by substantial evidence nor in accord with the law. A review of the evidence compels the conclusion that the IJ erred when it found that Melkonian left Abkhazia in part to better himself economically.[2] The uncontradicted testimony demonstrates that Melkonian fled Abkhazia in order to escape being kidnaped by Abkhaz Separatists and being either killed or sent to the front lines of the war. In fact, Melkonian specifically testified that he had hoped his escape to Russia would be temporary and that he could return to Abkhazia quickly, because that is where his economic livelihood lay. He had a house, a farm, and cattle in Gagra. His wife and son were there. He had everything to lose and nothing to gain (except his life) by leaving his home. There is no contrary evidence in the record.

---

**2.** Substantial evidence does support the conclusion that, having decided to flee Abkhazia, Melkonian chose Russia rather than another region in Georgia, in part for economic reasons. We discuss the significance of his choice of refuge in the next section.

But even if we accepted the IJ's finding that Melkonian left Abkhazia in part to seek better economic fortune (which constitutes a gross mis-characterization of his testimony), it would not preclude eligibility for asylum. Our case law makes clear that a fear of persecution need not be the alien's only motivation for fleeing. *Garcia–Ramos v. INS*, 775 F.2d 1370, 1375 (9th Cir.1985). Furthermore, given that Melkonian seeks asylum based on a well-founded fear of *future* persecution, his motivations for leaving—while probative—are not the ultimate issue. Rather, the proper inquiry is whether Melkonian's refusal *to return* to Abkhazia is based on a credible subjective fear of persecution by Abkhaz Separatists (a group no party disputes the Georgian government is unable to control); whether the persecution he fears is on account of a statutorily-protected ground; and whether that fear is objectively reasonable. *See* 8 U.S.C. § 1101(a)(42)(A); *Singh*, 134 F.3d at 966.

The IJ correctly identified Melkonian's desire to avoid conscription by the Abkhaz Separatists as the reason he fled Abkhazia. But insofar as the IJ believed that this somehow disqualified Melkonian from eligibility for asylum, the IJ premised his decision on a misunderstanding of the law. In *INS v. Elias–Zacarias*, the Supreme Court held that an attempt by a guerilla group to conscript an asylum seeker into military forces did not necessarily constitute persecution "on account of" political opinion within the meaning of § 208(a) of the INA. The Court explained that the statute seeks to protect against persecution on account of the victim's political opinion, not the persecutor's; the fact that guerillas seek to fill their ranks in order to carry on their war against the government and pursue their political goals, therefore, does not automatically render the forced recruitment "persecution on account of political opinion." 502 U.S. at 482, 112 S.Ct.

812. Nor, the Court went on, could an applicant establish a well-founded fear of future persecution absent some showing that the guerillas will persecute the applicant on his return because of his political opinion, rather than merely his refusal to fight with them. *Id.* at 483, 112 S.Ct. 812. *See also Canas–Segovia v. INS*, 970 F.2d 599, 601(9th Cir.1992) (explaining that pursuant to *Elias–Zacarias*, "the victim needs to show the persecutor had a protected basis (such as the victim's political opinion) in mind in undertaking the persecution").

In this case, Melkonian testified that the Separatists specifically targeted *Armenian* men to conscript and send to the front line where casualties ordinarily are highest. He also testified that the Separatists came to his home on the same day his father-in-law, the head of Melkonian's family, had spoken publicly against the Muslims and in favor of Christianity. Given this evidence, the Separatists' attempts to forcibly recruit Melkonian—unlike the guerillas' actions in *Elias–Zacarias*—are properly labeled "on account of" his ethnicity and religion, for he was singled out for this treatment because of these protected grounds. *See Cordon–Garcia v. INS*, 204 F.3d 985, 991 (9th Cir.2000) ("That persecution was 'on account of' one or more of the specified grounds may be shown by inference where the inference is one that may clearly be drawn from facts in evidence."). This is so even though the Separatists also sought to advance their own political ends. *See Navas v. INS*, 217 F.3d 646, 656 (9th Cir.2000) ("[T]he protected ground need only constitute *a* motive for the persecution in question; it need not be the *sole* motive.").

In any event, Melkonian does not base his asylum claim on a contention that the Separatists' pursuit of him constitutes past persecution within the meaning of § 208(a). Rather, he bases it on his fear

of what would happen to him upon his return to Abkhazia. Melkonian does not fear persecution if he were to return to Abkhazia merely because of his failure to fight with the Separatists. Rather, he fears he will be killed because of his prior support for the Georgians (political opinion), and because he is an Armenian (ethnicity) and a Christian (religion). Because his credibility has not been questioned, Melkonian's testimony concerning this fear suffices to meet the subjective component of the well-founded fear test. *Singh,* 134 F.3d at 966. The only question that remains, then, is whether this fear is supported by credible, direct, and specific evidence in the record. *See id.* We hold that "any reasonable factfinder would have to conclude" that Melkonian's fear of persecution based on a protected ground is objectively reasonable. *Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812.

■ According to the uncontradicted evidence in the record, the Separatists are currently in control of Abkhazia and have engaged in a systematic campaign of ethnic cleansing with the aim of eliminating all non-Abkhaz in the region, and have effectively succeeded—through torture, rape, and murder—in achieving just that. The State Department has reported that displaced persons from Abkhazia attempting to return do so at great personal risk. The risk to Melkonian is particularly high, given that the Separatists in Gagra specifically targeted him before his departure. They repeatedly broke into his home; they destroyed his property; they murdered a woman caring for his cattle; and they attempted to murder a man they mistook for his father-in-law. To satisfy the objective component of the well-founded fear test, an applicant need only produce credible evidence that persecution is a "reasonable possibility." *Singh I,* 63 F.3d at 1506. *See also INS v. Cardoza–Fonseca,* 480 U.S. 421, 440, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (ten percent probability suffi-

cient). The evidence compels the conclusion that Melkonian has more than met his burden.

### B

■ The IJ also concluded that Melkonian did not qualify for asylum because he could have relocated to another part of Georgia without facing persecution on a statutorily-protected ground. In so holding, the IJ misapplied the law. An applicant need not demonstrate a country-wide threat of persecution in order to qualify for asylum. *See, e.g., Singh I,* 63 F.3d at 1511; *Singh v. Ilchert (Singh II),* 69 F.3d 375, 380 (9th Cir.1995). The ability of an applicant to relocate to a place of safety within his country of origin may, however, be considered by the IJ in determining whether an applicant's fear is "well-founded." *Cuadras v. U.S. INS,* 910 F.2d 567, 571 n. 2 (9th Cir.1990); *Cordon–Garcia,* 204 F.3d at 991. Specifically, the IJ may deny eligibility for asylum to an applicant who has otherwise demonstrated a well-founded fear of persecution where the evidence establishes that internal relocation is a reasonable option under all of the circumstances. *See Cardenas v. INS,* 294 F.3d 1062, 1066 (9th Cir.2002). It is not enough, however, for the IJ to find that applicants could escape persecution by relocating internally. It must be reasonable to expect them to do so. *See id.* According to the United Nations Handbook:

> The fear of being persecuted need not always extend to the *whole* territory of the refugee's country of nationality. Thus in ethnic clashes or in cases of grave disturbances involving civil war conditions, persecution of a specific ethnic or national group may occur in only one part of the country. In such situations, a person will not be excluded from refugee status merely because he could

have sought refuge in another part of the same country, if under all the circumstances it would not have been reasonable to expect him to do so.

63 F.3d at 1511 (quoting UN Handbook, ¶ 91 (1979)). *See Damaize–Job v. INS,* 787 F.2d 1332, 1336 n. 5 (9th Cir.1986) ("The United Nations definition of what factors are relevant in determining refugee status are particularly significant in analyzing section . . . 208(a) claims. . . .").

 Evidentiary burdens regarding the reasonableness of internal relocation differ depending on the case. Two clear rules emerge from our decisions. First, because a presumption of well-founded fear arises upon a showing of past persecution, the burden is on the INS to demonstrate by a preponderance of the evidence, once such a showing is made, that the applicant can reasonably relocate internally to an area of safety. *Singh II,* 69 F.3d at 379. Second, where the applicant has established a well-founded fear of future persecution at the hands of the government, a rebuttable presumption arises that the threat exists nationwide and therefore that internal relocation is unreasonable. *Singh v. Moschorak,* 53 F.3d 1031, 1034 (9th Cir.1995); *Singh I,* 63 F.3d at 1511. In this case, Melkonian has established a well-founded fear of future persecution at the hands of the separatist movement that controls all of Abkhazia, rather than the established government that controls Georgia. In this circumstance, Melkonian is not disqualified from asylum eligibility merely because there are areas in the country where he would not face persecution, provided that he demonstrates the

unreasonableness of internal relocation. *Accord Lopez–Gomez v. Ashcroft,* 263 F.3d 442, 445–46 (5th Cir.2001).[3]

The IJ's conclusion that Melkonian could have relocated to other parts of Georgia without fear of persecution did not take into account the reasonableness of that relocation. Given that Melkonian established a well-founded fear of future persecution at the hands of Abkhaz Separatists, the IJ should have inquired whether the evidence presented by Melkonian established that it is unreasonable to expect him to relocate to another region within Georgia. The new regulations list, without limitation, some of the factors an IJ should consider when evaluating reasonableness:

> [A]djudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.

8 C.F.R. § 208.13(b)(3) (2001). *See also In re T–M–B–,* 21 I & N Dec. 775, 789, 1997 WL 80988 (BIA 1997) ("Determinations of 'reasonableness' include considerations of likely financial or logistical barriers to internal relocation, as well as the circumstances which fail to satisfy civil, political, and socioeconomic human rights norms, or place the refugee in illusory or unpredictable situations.") (Rosenberg, J., dissenting).

**3.** This approach is explicitly incorporated in the amendments to the governing regulations that took effect after the IJ rendered his decision, but before the BIA affirmed on appeal. *See* 8 C.F.R. § 208.13 (2001). Because the amendments are consistent with "the plain import of the law at the time of the applicant's hearing," *Manzoor v. United States*

*DOJ,* 254 F.3d 342, 348 (1st Cir.2001), we need not decide whether the BIA should have applied the new version on review. *But see Cardenas,* 294 F.3d at 1066 (citing to new version of 8 C.F.R. § 208.13 where the IJ decision was rendered before the effective date of the amendments).

Melkonian introduced evidence regarding the reasonableness of relocation, and he is entitled to have that evidence considered under the correct legal standard. For example, Melkonian testified that he did not take his son elsewhere in Georgia because of the ongoing war and the pervasive lack of food. Angela testified that there is "no way to live" elsewhere in Georgia. She explained that there is no food or other supplies, and that neither she nor Melkonian speak Georgian. The most recent Country Report in the record explains that "[i]nternal conflicts and the disruption of trade links with other republics of the former Soviet Union have left Georgia's economy in ruins." Country Reports on Human Rights Practices for 1994, at 814. It describes a country dependent on humanitarian grain shipments from abroad, wrought by an acute energy crisis, hyperinflation, and rampant corruption and crime. *Id.* at 814–815. We need not recount that evidence in detail here, however, for it is the job of the BIA to give it careful consideration on remand. *See INS v. Ventura*, ⎯⎯ U.S. ⎯⎯, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002).

▮▮▮▮ We note, however, two factors of particular significance. The first is the fact that Melkonian's wife and son have both been granted asylum in the United States. Familial ties are properly considered in determining the reasonableness of internal relocation. *See* 8 C.F.R. § 208.13(b)(3). The second is the unique status of Abkhazia. Abkhazia became part of Georgia only in 1931, and even then remained an "autonomous republic." It operated with its own autonomous local government throughout the Soviet era, and has now reasserted total independence. Relocation from Abkhazia to Georgia, while technically "internal," in reality is more akin to international relocation.

This fact may have particular salience, given that Melkonian does not even speak the Georgian language.

### C

▮▮▮ Finally, the IJ erred as a matter of law when it concluded that Melkonian was ineligible for asylum because he chose to come to the United States, rather than stay in Russia, for economic reasons. This court has previously held that a refugee need not seek asylum in the first place where he arrives. *Damaize–Job v. INS*, 787 F.2d 1332, 1337(9th Cir.1986). Rather, it is "quite reasonable" for an individual fleeing persecution "to seek a new homeland that is insulated from the instability [of his home country] and that offers more promising economic opportunities." *Id. See also Garcia–Ramos*, 775 F.2d at 1374–75 ("We do not find it inconsistent with a claimed fear of persecution that a refugee, after he flees his homeland, goes to the country where he believes his opportunities will be best."). Insofar as the IJ's decision held that Melkonian "firmly resettled" in Russia, the BIA's decision explicitly overruled that determination.

### IV. Constitutional Challenges

▮▮▮ Melkonian also raises two constitutional challenges. First, he contends that he was deprived of his right to Due Process as guaranteed under the Fifth Amendment due to his counsel's ineffective assistance. He points specifically to a comment made by his counsel at the close of his hearing testimony that denigrated the answers he had given during the hearing.[4] The BIA rejected Melkonian's due process challenge on the ground that he failed to comply with the requirements of *Matter of Lozada*, 19 I & N Dec. 637, 1988 WL 235454 (BIA 1988). In *Lozada*, the

---

**4.** The lawyer stated: "Your honor, for the record, if this is [sic] the answers that I had gotten, I would never have proceeded this far."

**1072**

BIA held that a petitioner alleging ineffective assistance of counsel must: (1) provide an affidavit describing in detail the agreement with counsel; (2) inform counsel of the allegations and afford counsel an opportunity to respond; and (3) report whether a complaint of ethical or legal violations has been filed, and if not, why. *Id.* at 639. Melkonian does not purport to have complied with these requirements, but claims that his noncompliance should be excused.

In *Castillo–Perez v. INS*, 212 F.3d 518, 525 (9th Cir.2000), this court explained that "the *Lozada* requirements are generally reasonable, and under ordinary circumstances, the BIA does not abuse its discretion when it denies a motion to remand or reopen based on an alleged ineffective assistance of counsel where the petitioner fails to meet the requirements of *Lozada*." We went on to specify, however, that the *Lozada* requirements are not "sacrosanct." *Id.* Where, for example, the "facts are plain on the face of the administrative record," the requirements of *Lozada* "are not dispositive." *Id.* at 525 (quoting *Escobar–Grijalva v. INS*, 206 F.3d 1331, 1335(9th Cir.2000)).

■ Given that Melkonian hinges his ineffective assistance claim on a single statement of his attorney, a statement recorded in the transcript of his hearing before the IJ, the relevant "facts are plain on the face of the administrative record." *Escobar–Grijalva*, 206 F.3d at 1335. We nonetheless affirm the BIA's rejection of Melkonian's ineffective assistance claim, because he has not established prejudice. *See Ortiz v. INS*, 179 F.3d 1148, 1153 (9th Cir.1999) ("Due process challenges to deportation proceedings require a showing of prejudice to succeed."). While a good advocate would not have made the comment made by Melkonian's lawyer, we assume that the IJ made his decision based on an analysis of the totality of the evidence, rather than on this single remark.

■ Second, Melkonian contends that he was denied due process because the IJ assumed a prosecutorial role during the hearing. The IJ did question Melkonian aggressively and sometimes harshly. Nonetheless, this does not, on the facts of this case, rise to the level of a due process violation. As we explained in *Antonio–Cruz v. INS*, 147 F.3d 1129 (9th Cir.1998), the due process clause does not prevent an IJ from examining a witness. *Id.* at 1131 (rejecting a due process claim premised on the fact that the IJ had conducted "the lion's share of cross-examination" in a "harsh manner and tone").

## V. Conclusion

A review of the evidence compels the conclusion that Melkonian established a well-founded fear of future persecution at the hands of Abkhaz Separatists on account of his ethnicity, were he to return to Abkhazia. We remand to the BIA to determine whether, under all of the circumstances, it is reasonable to expect Melkonian to relocate to another region within Georgia.

Because the BIA held that Melkonian had not established a well-founded fear of persecution under § 208(a), it did not consider whether he met the more stringent requirements for withholding of deportation under § 243(h). *See Berroteran–Melendez v. INS*, 955 F.2d 1251, 1258 (9th Cir.1992). If, on remand, the BIA determines that Melkonian qualifies for asylum under § 208(a), it should also consider his application for withholding of deportation.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.