**Zakia MASHIRI, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**\*

No. 02–71841.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2003.

Filed Sept. 22, 2004.

As Amended Nov. 2, 2004.

---

\* Attorney General John Ashcroft is substituted for the Immigration and Naturalization Service ("INS") as the proper respondent. Fed. R.App. P. 43(c)(2). The INS ceased to exist on March 1, 2003. *See Falcon Carriche v. Ashcroft,* 350 F.3d 845, 848 n. 1 (9th Cir. 2003).

Kathrin S. Mautino, Mautino & Mautino, San Diego, CA, for the petitioner.

Luis E. Perez, Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

Before HUG, B. FLETCHER, and WARDLAW, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

Zakia Mashiri ("Zakia") petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the denial of her applications for asylum, withholding of deportation and voluntary departure.[1] We grant the petition on the issue of asylum because Zakia's credible testimony compels a finding of past persecution and because the respondent ("the government") has failed to rebut the presumption of a well-founded fear of future persecution.

## I.

Zakia and her husband, Farid Mashiri ("Farid"), are natives of Afghanistan. The Mashiris moved to Germany in the 1970s and eventually settled in the German city of Bergedorf. Zakia became a German citizen. The Mashiris' two sons, Asil and Hadjir, were born in Germany and are also German citizens. Despite their German citizenship and the family's many years in Bergedorf, the Mashiris repeatedly experienced anti-foreigner threats and violence in Germany.

Farid, who worked as a taxi driver, was beaten twice by passengers in his cab. In March 1990, three passengers began making anti-foreigner statements and jokes during their ride. They invoked Germany's Nazi past, telling Farid that foreigners would now be treated as Jewish Germans had been treated under Hitler. When Farid objected to these statements, the passengers told him to shut up and punched him in the face. Farid pulled over to the side of the road, but the passengers began to punch and beat him even more. Farid was able to escape only because he pushed an alarm in his car that drew other taxis to the area. Farid was left with a swollen, sore face and a black eye, and he could not work for several days. The police responded to the scene of this incident but never made any arrests.

Farid was attacked a second time in December 1990. Two German passengers called him "Scheiss Ausländer," which means "shit foreigner," and told him to get out of their country. They beat Farid but ran away before he could hit the alarm button. Farid did not report this incident to the police because he knew a report would do no good.

After these attacks, Farid concluded that he could no longer work safely as a taxi driver. He returned to school to study information electronics but could not find work in his field after graduation, apparently because of an official workplace preference for ethnic Germans. Farid eventually returned to his job as a taxi driver despite the risk and his additional schooling.

On New Year's Eve 1993, the Mashiris were forced to hide from an anti-foreigner mob in their neighborhood. Neo–Nazis attacked a nearby store owned by a person of Turkish descent. At her asylum hearing, Zakia testified that the Mashiris could see the attack from their home and could

---

1. We refer to the petitioner and her immediate family members by their first names only in order to avoid confusion.

hear the neo-Nazis shouting anti-foreigner slogans:

> [N]ear our house there was [a] store that belong[ed] to a Turkish person and ... on that night, the neo-[N]azis attacked that shop and they burned it, they set it [on] fire and I was witness that they were throwing explosives into the store. And, they were shouting while doing this, that you are dirty foreigners, leave Germany because Germany is not your place and you don't belong to Germany. And, there, when I saw that ... I was in so much fear, I closed the door, shut the windows, shut all the doors, kept my children inside and we were so afraid and praying that they will, they may not realize that we too are foreigners here because then they are going to throw the same explosive into our house. And, that night, even though it was New Year's Eve, and ... my children would have liked to be outdoor enjoying the festivities, we did not, they did not leave. We all stayed there indoor and spen[t] the whole evening in fear.

Zakia and Farid purchased "steel-type drapes" to protect their windows from similar attacks.

In October 1995, the Mashiris discovered a threat on their car's windshield. It included the words "Heil Hitler" and said either "you" or "you foreigners" will be killed if you don't leave Germany. The Mashiris' tires were slashed; they had also been slashed in January 1995.

One month after receiving the October death threat, the Mashiris came home to find that their apartment had been ransacked. A rug and some jewelry had been stolen, but other valuable items were left behind. The Mashiris suspected that they had been specifically targeted as foreigners because of the threatening note left on their car a month earlier and because the attackers had tried to destroy the family's apartment. The attackers had destroyed furniture, torn the couch with a sharp knife, thrown a vase toward the window, and torn mattresses in the bedrooms. The attackers had even broken small souvenirs from the family's travels—including little statues of the Taj Mahal and Eiffel Tower. According to Zakia, it looked as if the attackers had "done things out of anger." The Mashiris reported this incident to the police, but the police closed the case after concluding that the attack was nothing more than simple theft.

A few months later, in February 1996, Zakia was forced to run from an anti-foreigner mob that had gathered at the train station near the Mashiris' home. As Zakia got off a train, she heard a group of Germans shouting slogans at foreigners, telling them to get out of Germany because "Germany belongs to Germans." Members of the group had sticks in their hands and were fighting someone, although it was too dark for Zakia to see more. They shouted "dirty foreigners [get] out" and "Heil Hitler." Zakia was immediately afraid:

> [A]s I got out of the train, as soon as I heard this noise, [it] suddenly dawn[ed] on me that, oh God, I am a foreigner and what should I do now.... I had a jacket that had a hood and I put the hood on so they would not see my hair, the color of my hair and realize that I am a foreigner. And, I was so afraid that ... I just didn't know what, what I should do. And, I was thinking that any, any moment they can come and they can attack me. And, that area there was a road, there was, I, I tried to, I took a short cut and I put myself in a road that I could get home quicker and I jumped, I jumped over a fence to get on a short cut road and to get to home quicker and because of that even injured my leg doing that out of fear. And, when I reached home, I cannot even

describe how horrified I was[.] I was in a very bad condition.

Zakia's fears proved to be well-founded. She learned later that several foreigners in her neighborhood were attacked and beaten severely with sticks that night. One man tried to run to escape, but the mob caught him at his doorstop and broke down the door of his house. The day before these events, a Nazi group had distributed a warning for foreigners in the Mashiris' neighborhood.

One month after this incident, in March 1996, a German man living in the Mashiris' neighborhood fired a gun over the heads of two Afghan children playing outside. The children were playing in front of the man's house, and he fired after telling them that foreigners shouldn't play there. The Mashiris' younger son, Hadjir, walked by the man's house every day on his way to school. After the shooting the Mashiris were too afraid to let him walk alone. They began to take Hadjir to school every morning, but because they could not leave work in the afternoon, they had to let him walk to day care after school. Zakia worried about this every day and would call the day care center to make sure Hadjir arrived safely.

The Mashiris' sons faced persecution even at school. Both were physically attacked and called names because they were viewed as non-German foreigners. The Mashiris' younger son, Hadjir, was beaten and humiliated by classmates at school. The students called him a "dirty foreigner" or a "refugee," and their physical attacks resulted in a permanent scar. When the Mashiris reported these incidents, they were told that the school neither could nor would do anything. School officials did not even report this behavior to the parents of the students involved. As a result of this response, the Mashiris concluded that school officials would not help them.

The Mashiris' older son, Asil, was attacked violently in May 1996. Four neo-Nazis followed Asil on his way home from school, called him a "foreigner," and asked him what he was doing in Germany. When Asil responded that he was a German citizen, one member of the group punched him in the face, another kicked him, and they threw him on the ground and beat him. Asil saw that one of the men had a Hitler mark on the back of his head.

During her deportation hearing, Zakia described opening the door for Asil as he tried to escape his attackers:

One day, a day that I can never ever[ ] forget in my life. It was in the month of May, and my oldest son was coming from, back from school. Usually, he has a key to open, he had a key to open the door, but on that day he was knocking at the door and ringing the door. And, his, he was full of blood.

. . .

[W]hen he came in, my child came, he was trembling, shaking, he was terrorized and, and he was bleeding on his face and he, they had cut his face on the side of his, near the eye on the lower part. . . . [T]o this day there is a mark on his face.

Zakia took Asil to the doctor and then to the police. The police asked Asil what had happened but he was too shaken to speak. Although the police gave Zakia a complaint form to fill out, they did not photograph Asil's injuries, follow up with Zakia or send an investigator to question Asil at a better time. The police told Zakia: "[I]f we find anything, we will let you know, but these things ... happen here a lot and you foreigners, you better try to take care of yourself." Zakia did not report what had happened to school officials because she no longer had "faith that any report or any-

thing could, could make any change or help us in any way."

Asil was fourteen at the time of this incident. He was terrorized and afraid, and could not return to school for several days. He became frustrated and discouraged. He began to lose interest in school and would take out his frustrations at home.

The Mashiris decided that they had no choice but to leave Germany. They considered the possibility of moving to a different city but decided against it because friends all over Germany told of similar problems and because they would have had to put their names on a three- or four-year waiting list in order to get a new apartment. In the declaration Zakia submitted in support of her asylum application, she explained that the decision to leave Germany was a difficult one for the family:

> I've lived in Germany for over seventeen years, my husband for twenty three years, and my children all their lives. We eventually became financially secure. Our jobs were secure. We had health insurance, and had bought extra insurance for any disability. We had life insurance and retirement insurance. We did not have any financial problems, and we could still afford to go out of Germany every vacation. . . . Still, I felt that it was crucial to leave Germany before something terrible happened to us.
>
> It is extremely difficult to explain what a difficult decision it was to leave Germany. We had gone through a great cultural shock to acclimate to the German lifestyle. We knew that coming to the United States would be another enormous upheaval in our lives and we would have to go through the many hardships and obstacles of adjusting to another culture and another language, especially for our children. We knew we had to leave behind a financially stable way of life in exchange for safety and low paid jobs while we learned another language and way of life.
>
> . . .
>
> We came to the United States to escape from anti-foreigner[ ] violence and to seek a safe future for our children. . . .

As an example of the sacrifice the Mashiris made in order to find safety, Zakia testified that she no longer works in her chosen field. Instead, she has taken a job working for McDonald's in Southern California.

## II.

 We have jurisdiction to consider Zakia's petition for review pursuant to section 106 of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1105a(a)(1) (1996).[2] We review the Immigration Judge's ("IJ's") decision directly because the BIA adopted it as the final agency determination. *Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1251 (9th Cir. 2004). We review the IJ's factual findings for substantial evidence. *Melkonian v. Ashcroft*, 320 F.3d 1061, 1065 (9th Cir. 2003). We must sustain factual findings that are supported by reasonable, substantial, and probative evidence in the record. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We

2. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") repealed 8 U.S.C. § 1105a and replaced it with new rules for judicial review. However, this case is governed by IIRIRA's transitional rules and we continue to have jurisdiction pursuant to 8 U.S.C. § 1105a(a)(1) because Zakia was placed in deportation proceedings prior to April 1, 1997, and the final order of deportation was issued after October 30, 1996. *See Kalaw v. INS*, 133 F.3d 1147, 1149–50 (9th Cir.1997).

review questions of law regarding the INA de novo. *Ladha v. INS*, 215 F.3d 889, 896 (9th Cir.2000). Although we give deference to the agency's interpretation of the statute, we will not defer to agency decisions that conflict with circuit precedent. *Id.*

### III.

 In order to be eligible for a grant of asylum, Zakia must establish that she is unable or unwilling to return to Germany "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (1996). Zakia may meet her burden with evidence of (1) a past incident, or incidents, that rose to the level of persecution; (2) that was on account of one of the statutorily-protected grounds; and (3) that was committed by the government or forces the government was either unable or unwilling to control. *Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir.2000). Proof of past persecution gives rise to a presumption of a well-founded fear of future persecution and shifts the evidentiary burden to the government to rebut that presumption. *Popova v. INS*, 273 F.3d 1251, 1259 (9th Cir.2001).

### A.

 Zakia has proved past persecution in this case with her credible account of a death threat, violence against family members, vandalism, economic harm and emotional trauma. We accept Zakia's testimony as undisputed because the IJ found her credible and the BIA made no contrary

finding. *R.J. Singh v. INS*, 94 F.3d 1353, 1356 (9th Cir.1996).

### Death Threat, Threatening Mob, Vandalism

 We have repeatedly held that threats may be compelling evidence of past persecution, particularly when they are specific and menacing and are accompanied by evidence of violent confrontations, near-confrontations and vandalism. *See, e.g., Ruano v. Ashcroft*, 301 F.3d 1155, 1160–61 (9th Cir.2002) (considering death threats as evidence of past persecution where petitioner had "near face-to-face confrontations" with his persecutors and persecutors directly confronted the petitioner's mother); *see also Cordon–Garcia v. INS*, 204 F.3d 985, 991 (9th Cir.2000) (stating that "threats of violence and death are enough" to constitute persecution).

In this case, the Mashiris received a specific and menacing threat; the note left on their car invoked the terror of Germany's Nazi past and threatened death if the family did not leave Germany. The death threat also does not stand alone as evidence of persecution. The Mashiris' tires were slashed and, one month after receiving the threat, the family came home to find that their apartment had been ransacked in a particularly violent way.[3] Not long after these incidents, Zakia was forced to run from a threatening anti-foreigner mob, injuring herself and terrifying her in the process. The Mashiris had also seen anti-foreigner groups act on their beliefs in the past—both when Farid was violently attacked in his taxi and when a store in the Mashiris' neighborhood was fire-bombed.

---

**3.** The IJ's determination that the attack on the Mashiris' home was a simple robbery is not supported by substantial evidence. The attack came not long after the anti-foreigner death threat; the attackers left valuable items untouched; and they apparently spent considerable time vandalizing the Mashiris' apart-

ment. The IJ pointed out that the attackers left no explicit anti-foreigner note or threat, but as Zakia's testimony indicates, no note was necessary because the violent ransacking of the apartment was itself an effective message.

Given these facts, the specific and menacing death threat the Mashiris received is strong evidence of persecution. The Mashiris had experienced and witnessed anti-foreigner violence in the past, and the apparently escalating events of 1995 and 1996 made the note the Mashiris received much more than an idle threat.

### Violence Against Family Members, Economic Harm

■ We have recognized that violence against family members and evidence of economic harm both may support an applicant's asylum claim. *See Baballah v. Ashcroft*, 367 F.3d 1067, 1074–76 (9th Cir.2004) (considering evidence of violence against the petitioner's brother and interference with the petitioner's ability to maintain a fishing business as support for the petitioner's asylum claim); *see also Salazar–Paucar v. INS*, 281 F.3d 1069, 1075 (9th Cir.2002) ("[E]vidence of harm to Petitioner's family supports a finding of past persecution."); *Kovac v. INS*, 407 F.2d 102, 106–07 (9th Cir.1969) (explaining that persecution may be economic). In this case, Zakia lived through violent attacks against all three members of her immediate family, and the violence interfered with Farid's ability to earn a living.

Both of Zakia's young sons were physically attacked because they were viewed as foreigners. Both were humiliated, terrorized, and left with permanent physical scars. The boys' German citizenship was no protection and, as Asil's violent encounter suggests, may even have angered the boys' attackers.

Farid was also attacked on two occasions by passengers in his taxi. He was unable to work for several days after the attacks, and he concluded that he could no longer work safely as a driver. He returned to school in an attempt to change fields, yet after two years of additional study he was unable to find work because of a workplace preference for ethnic Germans.

### Emotional Trauma

■ Persecution may be emotional or psychological, as well as physical. *See Duarte de Guinac v. INS*, 179 F.3d 1156, 1163 (9th Cir.1999) (referring to petitioner's past persecution as including "physical and mental abuse"); *see also Hernandez–Montiel v. INS*, 225 F.3d 1084, 1097–98 (9th Cir.2000) (explaining that rape is a form of persecution in large part because of its psychological effect); *Kovac*, 407 F.2d at 105–07 (explaining that persecution requires harm or suffering, not *physical* harm). In this case, Zakia's testimony provides compelling evidence of the emotional trauma she endured. Zakia watched as a foreign-owned store in her neighborhood was firebombed, afraid that her home and family would be next. She came home to find her own home vandalized and ransacked. She ran in fear from a violent mob that attacked other foreigners in her neighborhood that night. She read in the newspaper about a German man who lived along Hadjir's path to school who shot over the heads of two Afghan children playing in his front yard. She opened the door to her son Asil as he ran, bleeding, from a neo Nazi gang. She then watched as Asil became angry and frustrated and lost interest in school.

Not surprisingly, Zakia testified credibly that these events caused constant fear and anxiety. The Mashiris did what they could—they bought steel-type drapes; they began walking Hadjir to school; Farid tried to change careers. When nothing worked, the family understandably decided that they had no choice but to leave Germany.

### Cumulative Effect

We need not and do not decide whether any one of Zakia's experiences would be

enough, standing alone, to establish past persecution. *See Surita v. INS,* 95 F.3d 814, 819 (9th Cir.1996) ("[W]hile a single incident, in some instances, may not rise to the level of persecution, the cumulative effect of several incidents may constitute persecution."). Viewed cumulatively, Zakia's evidence of a death threat, violent physical attacks against her husband and sons, a near-confrontation with a violent mob, vandalism, economic harm and emotional trauma compels a finding of past persecution. *See Baballah,* 367 F.3d at 1076–77 (holding that economic persecution, threats and attacks against the petitioner and his family compelled a finding of past persecution).

### B.

Zakia testified that she believes she and her family were targeted because they were viewed as non-German foreigners. She also testified specifically about anti-foreigner slogans or symbols that accompanied nearly every violent incident the Mashiris witnessed or experienced. This evidence satisfies the requirement that Zakia provide some direct or circumstantial evidence that she was persecuted on account of her race and nationality. *See id.* at 1077 (holding that petitioner's own belief and persecutors' use of the derogatory slur "goy" satisfied the "on account of" prong).[4]

### C.

■ Zakia has also provided evidence that the government was unwilling or unable to control the anti-foreigner violence she and her family experienced at the hands of non-state actors. *See Avetova–Elisseva v. INS,* 213 F.3d 1192, 1196 (9th Cir.2000) ("[A]ffirmative state action is not necessary to establish a well-founded fear of persecution if the government is unwilling or unable to control those elements of its society responsible for targeting a particular class of individuals.") (internal quotation marks omitted). Zakia testified that the police made no arrests after Farid was beaten; that officials at Hadjir's school flatly refused to help the Mashiris; that the police quickly closed their investigation into the attack on the Mashiris' apartment as simple theft, despite evidence that the attack was motivated by anti-foreigner hatred; and that the police told the family after Asil's beating that such things happened all the time and that foreigners "better try to take care of [themselves]." Zakia testified that the police could or would do nothing, and she submitted newspaper articles about neo-Nazi influence in the German armed forces, as well as two Amnesty International reports documenting allegations of a "clear pattern of police ill-treatment of foreigners and members of ethnic minorities" in Germany.[5]

Before the IJ, the government relied on the State Department's 1996 Country Report to argue that Zakia could not prove

---

4. As is often the case, it appears that Zakia was persecuted on account of some combination of her race and national origin. We have recently used the term "ethnicity" when describing similar examples of combined persecution. *See Shoafera v. INS,* 228 F.3d 1070, 1074 n. 2 (9th Cir.2000). "Ethnicity" describes a category that "falls somewhere between and within the protected grounds of 'race' and 'nationality.'" *Duarte de Guinac v. INS,* 179 F.3d 1156, 1159 n. 5 (9th Cir.1999).

5. The government argued before the IJ that Zakia's testimony established that German police had "properly investigated" each incident of anti-foreigner violence. This is not true. Zakia testified that the police conducted very limited investigations, if any, and that the Mashiris saw no results. The police statement that "foreigners ... better try to take care of [themselves]" made it clear that the Mashiris could not count on local officials for protection and that the police were either unable or unwilling to control the persecution the family was experiencing.

that the German government was unwilling or unable to control anti-foreigner violence. *See* Bureau of Democracy, Human Rights and Labor, United States Dep't of State, 1996 Country Report on Human Rights Practices—Germany (Jan. 30, 1997). The IJ agreed, at least in part. He ruled that Zakia had failed to meet her burden of proof because she could not prove "harm or fear of harm from a group that the[German] government is unwilling or unable to control on a *country-wide* basis."

 The IJ erred in requiring Zakia to prove that the German government was unable or unwilling to control anti-foreigner violence "on a countrywide basis." We have never required an applicant proceeding on a past persecution theory to prove that her *"past* experience reflected conditions nationwide." *H. Singh v. Ilchert,* 63 F.3d 1501, 1510 (9th Cir.1995); *see also Melkonian,* 320 F.3d at 1069 ("An applicant need not demonstrate a country-wide threat of persecution in order to qualify for asylum."). Instead, an asylum applicant may meet her burden with evidence that the government was unable or unwilling to control the persecution in the applicant's home city or area. *See Ladha,* 215 F.3d at 902 (assuming the petitioners' credibility and holding that they met their burden with evidence that the government was unable to control religious and political violence in their home city, Karachi, during the relevant period).

In *Korablina v. INS,* 158 F.3d 1038 (9th Cir.1998), we held that the Ukranian petitioner satisfied this final requirement for asylum eligibility with her testimony that Kiev authorities were anti-Semitic and unwilling to protect Jews, and with supplemental articles that supported her conten-

tion. *Id.* at 1045. Here, as in *Korablina,* the evidence in the record compels the conclusion that Zakia was persecuted by forces the government was unable or unwilling to control. *See Korablina,* 158 F.3d at 1045; *see also Navas,* 217 F.3d at 656 n. 10 ("[P]olice inaction in the face of . . . persecution can suffice to make out a claim.").

### D.

 Because any reasonable factfinder would be compelled to find that Zakia has proved past persecution, the burden shifts to the government to rebut the presumption that Zakia is eligible for asylum. *See Popova,* 273 F.3d at 1259. One way the government may meet its burden is with evidence that relocation within Germany is a safe and reasonable alternative to asylum. *See Melkonian,* 320 F.3d at 1069–70. The IJ relied on internal relocation in his decision in this case, stating that Zakia failed to establish that she "could not have gone to any of the other 15 states in Germany and lived there." We grant the petition and remand because the IJ's decision on this point rests on a mistake of law and is not supported by substantial evidence.

 First, the statement quoted above indicates that the IJ placed the burden of proof regarding internal relocation on the petitioner, requiring Zakia to disprove relocation as a safe, reasonable alternative to asylum. Under our precedent, however, Zakia's compelling evidence of past persecution shifts the burden to the government to prove, by a preponderance of the evidence, that Zakia could relocate safely and that it would be reasonable to expect her to do so.[6] *Melkonian,* 320 F.3d at 1070 (distinguishing between past persecution

---

**6.** We note that this approach to burdens of proof is explicitly incorporated in amendments to the governing regulations that took effect after the IJ made his decision but be-

fore the BIA affirmed. 8 C.F.R. § 208.13(b)(1)(ii) (2001), *as amended by* 65 Fed.Reg. 76133 (Dec. 6, 2000) (amendment effective Jan. 5, 2001).

and future persecution cases). The IJ erred by placing the burden of proof on Zakia rather than on the government.

Second, the IJ's conclusion regarding internal relocation is not supported by substantial evidence in the record. As to the safety of relocation, Zakia testified credibly that friends throughout Germany reported anti-foreigner violence, and as to the feasibility, she testified about a long wait for housing. The State Department Report actually supports Zakia's testimony that friends reported violence throughout Germany; it documents declining but continued violence, and continued reports of police abuse. It states that anti-foreigner violence continued to occur "within society as a whole" without pointing to any specific, safe area within Germany. *See Cardenas v. INS,* 294 F.3d 1062, 1067 (9th Cir.2002) (holding that a State Department Report was inadequate to prove that the petitioner could relocate internally where the Report did not identify a safe area within Peru); *see also* 8 C.F.R. § 208.13(b)(3) (2001) (setting out a nonexhaustive list of relevant factors to consider, including "whether the applicant would face other serious harm in the place of suggested relocation"). With respect to the reasonableness of internal relocation, Zakia testified credibly that a move would be difficult for the Mashiris because they would have to wait years for a new apartment. *See In re T–M–B,* 21 I. & N. Dec. 775, 789, 1997 WL 80988 (BIA 1997) ("Determinations of 'reasonableness' include consideration of likely financial or logistical barriers to internal relocation....") (Rosenberg, J., dissenting), *cited in Melkonian,* 320 F.3d at 1070. The record also includes evidence that Zakia's mother and sister have been granted lawful permanent residency in the United States and that Zakia's brother is a naturalized U.S. citizen; we recognized in *Melkonian* that family ties in this country weigh against internal relocation. *Melkonian,* 320 F.3d at 1071.

Simply put, the State Department Report's general observations and description of Germany as a functioning democracy do not rebut Zakia's testimony that friends told of violence elsewhere, nor do they provide a response to Zakia's testimony about the difficulty the Mashiris would face if they tried to relocate or to the evidence of Zakia's family ties in the United States. We hold that Zakia is entitled to asylum.[7] We remand for the Attorney General to exercise his discretion as to whether to grant that relief.

### IV.

Because the IJ held that Zakia failed to prove her eligibility for asylum, he assumed that she could not meet the higher standard necessary to prove that she is entitled to withholding of deportation. *See Al–Harbi v. INS,* 242 F.3d 882, 888–89 (9th Cir.2001). Rather than apply the withholding standards to the evidence ourselves, we remand the issue of withholding so that the IJ may apply the law to the facts in the first instance. *See Jahed v. INS,* 356 F.3d 991, 1001 (9th Cir.2004).

### V.

We conclude that Zakia is eligible for asylum and we remand so that the Attorney General may determine whether to grant that relief. We also remand for further consideration of Zakia's withholding claim.[8]

**PETITION GRANTED.**

---

7. Since the petitioner, although it was not her burden, presented substantial evidence that relocation was neither safe nor feasible, the burden shifted to the government at that point to rebut her evidence. The government did not do so. Under these circumstances a remand under *INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) is unnecessary. *See Baballah v. Ashcroft,* 367 F.3d 1067, 1078 n. 11 (9th Cir. 2004).

8. In light of our conclusion that Zakia is eligible for asylum and our remand for fur-

ther consideration of the withholding issue, we need not reach Zakia's alternative request for voluntary departure at this time.