**Edin Arcenio RUANO, Petitioner,**

v.

**John ASHCROFT, Respondent.**

**No. 01–70915.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 13, 2002.

Filed Aug. 29, 2002.

---

Amos Lawrence (argued), San Francisco, CA, for the petitioner-appellant.

Audrey Benison Hemesath (argued), United States Department of Justice, Office of Immigration Litigation, Washington, D.C. Appearances only by Robert D. McCallum Jr., United States Department of Justice, Civil Division, Richard M. Evans, United States Department of Justice, Washington, D.C.; and Alison R. Drucker,

United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent-appellee.

Before: SCHROEDER, Chief Judge, D.W. NELSON and REINHARDT, Circuit Judges.

D.W. NELSON, Circuit Judge.

When you have received multiple death threats at your home and place of business; when you have been followed by and narrowly escaped four armed men trying to kill you; and when you have been targeted because of your membership in a political party, a rational factfinder could only conclude that you have suffered past persecution.

## FACTUAL AND PROCEDURAL BACKGROUND

Edin Arcenio Ruano is a native and citizen of Guatemala. In 1991, Ruano fled his native country with the intention of coming to the United States. In February of the same year, he entered the U.S. near San Ysidro, California; his entry was made, however, without inspection by the INS as required by federal statute. *See* 8 U.S.C. § 1251(a)(1)(B) (1994) (now codified at 8 U.S.C. § 1227(a)(1)(B)). Approximately five years after Ruano made his way across the border, he was tracked down by the INS and served with an Order to Show Cause.

At his initial appearance before the Immigration Judge ("IJ"), Ruano conceded that he was deportable as charged, but requested asylum and withholding of deportation based on persecution he had allegedly faced in Guatemala. The IJ contin-

ued the hearing to a later date, at which time the immigration court heard Ruano's evidence of persecution.

### A. Ruano's testimony before the IJ

Ruano testified that around the age of 25, he joined a political party in Guatemala known as the National Center Union, or "UCN." When he joined the party, Ruano was made Assistant Secretary General of the UCN's Guatemala City chapter. His duties as Assistant Secretary General were varied, but included attending meetings, delivering documents, giving talks to people both inside and outside Guatemala City, driving a party vehicle on weekends, and organizing about one mass protest every year. Ruano also testified that he got a job working for the government, and that his father was a military recruiter.

In 1985, about a year after he joined UCN, Ruano testified that he began receiving death threats in the mail. The threatening letters would come to both Ruano's home and to his work. The death threats were always signed with the nickname "Los Gavilanes" (translated: "the sparrow hawks"). When Ruano asked his co-workers about Los Gavilanes, he was told that they were a guerilla organization that operated in Guatemala.

Ruano testified that the letters threatening him with death came consistently from 1985 until 1991, and that all told, he received 30 to 35 letters—the last four of which he saved and were admitted into evidence below. Ruano testified that the letters routinely mentioned his membership in the UCN as a reason why he was being targeted.[1] An excerpt from one of the letters reads: "We've been observing that you are involved with the shit of a queer party as is UCN, we're giving you a

---

1. Ruano also testified that the letters would also occasionally mention the fact that his father was a military recruiter.

time limit of 15 days so you get the hell out of here, you son of a bitch . . . if you don't leave we'll kill you right away." Ruano sought help on several occasions from the Guatemalan police and showed them the letters he had been receiving. However, Ruano testified that the police were never able to help and that they would only promise that they would investigate.

Things got worse for Ruano in 1987. Until that point, he had maintained his membership in UCN and refused to heed the letters' demand that he leave the country. But beginning that year (1987) and continuing to 1991, four armed men in a black Toyota began following Ruano and tried to corner him on several occasions. Ruano testified that he had many face-to-face close calls with his anonymous pursuers, but that they were never able to catch him. When they would come to his home, and even ask his mother to divulge his whereabouts, Ruano would evade the men by escaping through neighbors' houses. He also eluded the men by going out the back door when they came to his office, by riding public transportation (and getting off at different stops) instead of taking his chauffeured government car, and, toward the end of his time in Guatemala, by living at a neighbor's home. Ruano stated that during the same time that he was being pursued (1987–1991), he would hear through friends and the media that other members of UCN—10 to 15 people according to Ruano's testimony—had been killed by guerillas.

In 1989, Ruano decided that, due to the continuing death threats and pursuit by the men in the black Toyota, he had to quit his involvement with UCN or he would end up dead like his former UCN co-workers. When quitting the party failed to stop the threats and harassment, Ruano decided to quit his job as well because he felt it was no longer safe to work there. This, again,

did nothing to deter his persecutors. Finally, on February 6, 1991, one week after receiving yet another letter threatening his death, Ruano decided enough was enough—he fled Guatemala and headed for the U.S.

Ruano testified that after he left Guatemala, he still kept up with events in his native country. Two events that he heard about after he left bear repeating. First, the head of the Guatemala City chapter of UCN, Jorge Carpio Nicol, was killed by guerillas in 1993. Second, Ruano's father, who had remained in Guatemala disappeared, and Ruano believes that he has been killed by guerillas as well.

## B. The IJ and BIA decisions

The IJ denied Ruano's asylum and withholding of deportation requests. In his oral decision, the IJ did not make an adverse credibility finding as to Ruano's testimony. However, the IJ decided that there was "simply not enough evidence in the record to support a finding that this respondent [Ruano] was ever harmed, or harmed to a level that could be described as persecution, in any way in Guatemala." The IJ also relied on a State Department report to conclude that no one would have an interest in harming Ruano if he were sent back because only high-profile activists were targeted, and only in their home communities. The IJ therefore denied Ruano's application for asylum and withholding of deportation, but did allow him voluntary departure.

On appeal, the BIA affirmed the IJ's denial of Ruano's application for asylum and withholding. The BIA determined that it had to accept Ruano's testimony as credible, given that the IJ made no adverse credibility finding. However, the BIA concluded that even taking Ruano's story at face value, he was not "harmed to the level of persecution." More specifical-

ly, the BIA relied on our decision in *Lim v. INS*, 224 F.3d 929 (9th Cir.2000), to conclude that the threats Ruano received did not constitute past persecution. In addition, the BIA held that Ruano could not show a well-founded fear of future persecution because his fear was not objectively reasonable and because he would be able to relocate to another part of Guatemala and avoid persecution.

## STANDARD OF REVIEW

■ This case falls under IIRIRA's transitional rules. Ruano's petition for review is therefore before the panel under formerly-existing 8 U.S.C. § 1105a(a), which allows a Court of Appeals to review denials of discretionary relief by the INS. Under § 1105a(a), the panel must uphold the BIA's denial of asylum if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Reyes–Guerrero v. INS*, 192 F.3d 1241, 1244 (9th Cir.1999) (citations and internal quotation marks omitted); *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (stating that the BIA should be reversed only if no reasonable factfinder could find the petitioner ineligible for asylum). The BIA's denial of withholding of deportation is similarly reviewed for substantial evidence. *Id.*

## DISCUSSION

■ Because neither the BIA nor the IJ made an adverse credibility finding, we accept Ruano's testimony before the IJ as true. *Lim*, 224 F.3d at 933. Ruano's testimony, along with documentary evidence in the record, indicates that he was targeted for death threats and harassment (by armed men) at least in part because of his membership in UCN. *Ante* at 1157–58; *see also Lim*, 224 F.3d at 934 (explaining that persecution is on account of political opinion so long as the political opinion is at least *part* of the motivation for the

persecution). Because he was targeted because of his political beliefs, and accepting Ruano's testimony as true, we hold that a reasonable factfinder could only have concluded that Ruano was eligible for asylum and entitled to withholding of deportation.

### A. Legal Framework

■ In order to be eligible for asylum and/or withholding of deportation, Ruano must show that he is "unwilling or unable" to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (defining "refugee"). Persecution is "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Rios v. Ashcroft*, 287 F.3d 895, 900 (9th Cir.2002) (internal quotation marks and citations omitted).

■ Evidence of past persecution alone can establish a well-founded fear of persecution. *See Ratnam v. INS*, 154 F.3d 990, 994 (9th Cir.1998). "Establishing past persecution triggers a rebuttable presumption of a well-founded fear of future persecution." *Reyes–Guerrero*, 192 F.3d at 1244–45; 8 C.F.R. § 208.13(b)(1)(i). We conclude that Ruano is eligible for asylum and entitled to withholding of deportation; Ruano has demonstrated past persecution, and the INS has done nothing to rebut the resulting presumptive fear of persecution in the future.

### B. Past Persecution

#### 1. Asylum

We determine whether Ruano has made out a sufficient case of past persecution by comparing the facts of this case to cases in which we have, and have not, found past persecution. When we make this compari-

son, we find that Ruano has carried his burden. More specifically, Ruano makes the required showing because the facts of his case are distinguishable from those in *Lim*—where we found no past persecution—and similar to those in *Reyes–Guerrero*—where we did find past persecution.

In *Lim*, we were confronted with the asylum claim of a former police officer in the Philippines who fled his native country and came to America. *Lim*, 224 F.3d at 932. While a police officer back in the Philippines, Lim was an undercover agent responsible for infiltrating the New People's Army ("NPA"), the military arm of a local Communist Party organization. *Id.* Lim eventually was called to testify against several NPA members, who were acquitted of the charges against them. Shortly after testifying against the NPA, Lim began receiving death threats both in the mail and by phone. *Id.* at 932–33. Lim left the police force about two years after the threats began, but the threats did not stop. *Id.* at 933. Three years later, three of Lim's former colleagues in the police force were murdered. *Id.* Lim also began to notice that he was being followed by unidentified men. *Id.* At no time, however, did these men (or anyone else) ever confront or attack Lim or his family. *Id.*

We held that the threats and events described by Lim in his testimony were not enough to establish past persecution.[2] We first stated that unfulfilled threats alone generally do not constitute past persecution. *Id.* at 936. Rather, we explained that actual suffering or harm is necessary to establish past persecution. *Id.* at 936. We then noted that neither "Lim nor his family was ever touched, robbed, imprisoned, forcibly recruited, de-

tained, interrogated, trespassed upon, or even closely confronted." *Id.* Because Lim had never been closely confronted, or otherwise harmed, the Court concluded that he could not make out a case of past persecution.

Ruano's case is distinguishable from *Lim* because he was "closely confronted" and put in harm's way on numerous occasions by men he knew to be armed and out to get him. Ruano testified that he was repeatedly chased by four well-built men in a black Toyota from 1987 until 1991. Ruano stated that he had near face-to-face confrontations with the men, that they would come to his home and ask his mother where to find him, and that they would also pursue him at his job. *See ante* at 1158. He further testified that he saw that the men were armed with pistols and that the men would draw their weapons in his presence (before he would elude them). He also testified that 10 or 15 of his co-workers at UCN had been killed during the time he was being chased and that he believed they had been killed by the same four men. By contrast, Lim was never closely confronted or, as in Ruano's case, actively chased by men he knew were armed; Lim was never pursued while at home; nor was Lim's family ever confronted or asked about Lim's whereabouts.

*Lim* acknowledged that there would be certain extreme cases (unlike Lim's) where "repeated and especially menacing death threats can constitute a primary part of a past persecution claim, particularly where those threats are combined with confrontation or other mistreatment." *Lim*, 224 F.3d at 936. What *Lim* portends, we have. Ruano was not only repeatedly threatened with death, he was hunted down (albeit unsuccessfully) by men with

---

**2.** We did hold, however, that the facts established that Lim had a well-founded fear of

future persecution. *Lim*, 224 F.3d at 939.

pistols who were out to harm him. Indeed, this case is really no different from *Reyes–Guerrero,* a case that was cited with approval in *Lim* and that held that the petitioner, Carlos Reyes, had suffered past persecution. *See id.* Reyes was a prosecutor in Colombia's Ministry of Justice and a member of the Conservative Party. *Reyes–Guerrero,* 192 F.3d at 1243. Reyes was assigned to investigate and prosecute an embezzlement scheme designed to enrich the rival Liberal Party. *Id.* Four years after he was assigned to the case, he began receiving death threats warning him to stop pursuing the investigation. *Id.* Reyes was also approached twice in 1989 and offered bribes to drop the investigation. *Id.* Reyes refused to stop the investigation, and the death threats did not stop either—even after the defendants in the embezzlement case were convicted. As the result of the continued threats, Reyes (and his wife) fled Colombia and came to the United States in 1991.

Confronted with these facts, the Court in *Reyes–Guerrero* reversed the BIA and held that Reyes had suffered past persecution in Colombia. *Id.* at 1246. We reach an identical conclusion here. Reyes received multiple death threats over a period of seven years; Ruano received multiple death threats over a period of six years. Reyes was confronted on two occasions by men seeking to bribe him to drop his investigation; Ruano was chased on multiple occasions by four men armed with pistols. Ruano's case thus presents an adequate, if not more compelling, case of past persecution when compared to our decision in *Reyes–Guerrero.*

The government attempts to distinguish *Reyes–Guerrero* from this case by claiming that Ruano, in contrast to Carlos Reyes, apparently did not feel compelled to change vehicles, residences, offices, and phone numbers. The government's claim is simply wrong. Ruano testified that he

gave up his state–provided chauffeured car and took public transportation; he stated that he would stay in neighbors' homes to elude his pursuers; and he stated that he quit his job because he no longer felt safe working there.

The government also claims that, under an INS regulation promulgated in 2001, still more is required to grant Ruano asylum. The regulation states that an asylum application should be denied if the INS rebuts the presumption of a well-founded fear of future persecution by establishing (by a preponderance of the evidence) that (a) there has been a fundamental change in circumstances in the alien's home country, or (b) the alien could avoid future persecution by relocating to another part of his or her home country. *See* 8 C.F.R. § 208.13(b)(1)(i). Assuming that this regulation can be applied to Ruano under IIRI-RA's transitional rules, he nevertheless is still eligible for asylum because the INS has not made the required showing.

The 1996 State Department report offered by the INS in Ruano's case is not sufficient to establish that there has been a fundamental change in circumstances in Guatemala. In a very recent case, we held that a 1998 State Department report on Guatemala was insufficient to establish changed country conditions. *Rios,* 287 F.3d at 901–02. The Court in *Rios* explained that the State Department report was insufficient because it only provided information about general changes in the country and did not provide any evidence refuting the petitioner's claim on an individualized basis. *Id.* at 901. The evidence is similarly lacking here. The relevant portion of the State Department report in the record indicates that:

> Members of legal political parties in Guatemala, especially the Union Civica Nacional (UCN) and the Movimiento Nacional de Liberacion (MLN), occa-

sionally complain of threats and violence by guerrilla forces, police or military personnel, or members of opposing parties.... In our experience, only party leaders or high-profile activists generally would be vulnerable to such harassment, and usually only in their home communities.

This passage provides no insight into Ruano's individual situation; it says nothing specifically about Guatemala City and it says nothing about whether Ruano is a high-profile activist. Factually, Ruano does seem high-profile. He would drive a UCN vehicle on weekends, give UCN talks in Guatemala City and beyond, and organize a mass UCN protest every year. Moreover, Ruano testified before the IJ that he was a leader and a high-profile activist. The State Department report also provides no specific information about Ruano's threateners, Los Gavilanes. Given all that the report lacks, we think that if anything the report *corroborates* Ruano's fear of persecution from his UCN membership—especially in light of the deaths of his co-workers and the chapter leader, Jorge Carpio Nicol.

Nor does the State Department report satisfy the INS's burden to show that Ruano could avoid future persecution by relocating to another part of Guatemala. The report states that violence against UCN members was usually confined to their home communities. As Ruano points out, however, Los Gavilanes did not target Ruano because of a localized dispute or concern. Ruano testified that his UCN duties took him outside Guatemala City— significantly increasing his exposure beyond any limited region.[3] Furthermore, Ruano also points out that there is no evidence in the record that Ruano's pursuers only operated in a circumscribed area or region. It is the INS's burden to

establish that Ruano could relocate, and given the above, the INS has failed to carry its burden here.

### 2. Withholding of deportation

■ Because we hold that Ruano is eligible for asylum based on past persecution, Ruano is also entitled to the rebuttable presumption that he has a well-founded fear of persecution in the future. Following *Reyes–Guerrero* and *Rios*, Ruano is also therefore entitled to withholding of deportation because the INS has not sufficiently rebutted the presumption.

*Reyes–Guerrero* holds that the presumption of future persecution triggered by a finding of past persecution is sufficient to entitle an alien to withholding of deportation if the presumption goes unrebutted. *Reyes–Guerrero*, 192 F.3d at 1246 ("Because the INS did not rebut the presumption that it is more likely than not that petitioners' lives or freedom would be threatened upon returning to Colombia, the BIA erred by denying their withholding of deportation."). We took the same approach in the more recent *Rios* decision as well. *Rios*, 287 F.3d at 902 ("A determination of past persecution such that a petitioner's life or freedom was threatened creates a presumption of entitlement to withholding of deportation.") (internal quotation marks and citation omitted). Given our conclusion above that the INS did not rebut Ruano's well-founded fear presumption by offering the 1996 State Department report, we conclude that Ruano is also entitled to withholding of deportation.

### CONCLUSION

We **GRANT** Ruano's petition for review, **GRANT** Ruano's request for withholding of deportation to Guatemala, and **RE-**

---

**3.** It is also worth noting that the death threats Ruano received told him to get out of the

*country,* not Guatemala City or some other small region.

MAND Ruano's asylum application for determination by the Attorney General.