**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DASHDAVAA JAVHLAN and
LHAYAJAV TUMURBAATAR,
                    *Petitioners,*

            v.

ERIC H. HOLDER JR., Attorney
General,
                    *Respondent.*

No. 06-71565

Agency Nos.
A096-364-969
A096-364-930

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
October 4, 2010—Pasadena, California

Filed December 3, 2010

Before: Harry Pregerson, Dorothy W. Nelson and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Pregerson;
Dissent by Judge Ikuta

19277

## COUNSEL

Louis A. Gordon (argued), Law Offices of Louis A. Gordon, Los Angeles, California, and David B. Gardner, Law Offices of David B. Gardner, Los Angeles, California, for the petitioners.

Norah Ascoli Schwarz (argued), Senior Litigation Counsel, U.S. Department of Justice Office of Immigration Litigation, Washington, D.C., and Michael E. Davitt, U.S. Dept. of Justice, Criminal Division, Washington, DC., for the respondent.

**OPINION**

PREGERSON, Circuit Judge:

Dashdavaa Javhlan[1] ("Javhlan "), a native and citizen of Mongolia, petitions for review of a decision by the Board of Immigration Appeals ("BIA") denying her applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). An immigration judge ("IJ") denied Javhlan's applications for relief and the BIA affirmed without opinion pursuant to 8 C.F.R. § 1003.1(e)(4). Thus, we review the IJ's decision as the BIA's final determination. *Lanza v. Ashcroft*, 389 F.3d 917, 925 (9th Cir. 2004). We have jurisdiction under 8 U.S.C. § 1252. We grant the petition for review and remand to the BIA for further proceedings.

We review a decision that an applicant has not established eligibility for asylum and withholding of removal under the substantial evidence standard. *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992). "[The BIA] can be reversed only if the evidence presented . . . was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.*

Because the IJ did not make an adverse credibility determination, we take Javhlan's testimony as true. *Navas v. INS*, 217 F.3d 646, 652 n.3 (9th Cir. 2000). The following facts are thus

---

[1]Lhayajav Tumurbaatar ("Tumurbaatar") is also a party in this case. Tumurbaatar is Javhlan's husband, and is derivatively eligible for asylum through Javhlan's asylum application. *See* 8 U.S.C. § 1158(b)(3) ("A spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien."); *see also* 8 C.F.R. § 1208.21. The couple has a son who was studying at Istanbul University in Turkey at the time of Javhlan's hearing before the IJ.

drawn from Javhlan's testimony at her hearing before the IJ and from Javhlan's supporting documents.

Javhlan grew up hearing her grandparents talk about their fears of communist rule in Mongolia. She also heard the story of how her deceased paternal grandfather, a Buddhist Monk, was tortured and killed by agents of the communist government in 1937. As an adult, Javhlan refused to join the Communist Party. She also refused to serve as a spy for the communist Secret Police by acting as their "eyes and ears" at the Mongolian British and Indian embassies where the Mongolian Ministry of Foreign Affairs had placed her. At another time, Javhlan worked at the United Nations Development Programme (UNDP) in Mongolia where again she was pressured and refused to spy for the Secret Police.

Secret Police agents approached Javhlan frequently on her way to and from work and threatened her with assault, imprisonment, rape, and death because she refused to act as a spy for them. Secret Police agents told her, "[W]e have the power to arrest you and we will show you that there's not a life of prison. We can do anything. We can rape you. We will show you what misery is all about." In June 1995, a Secret Police Captain named Ganbold arrested Javhlan and took her to a prison, where she was interrogated for four to five hours. Captain Ganbold shouted at Javhlan that she was a traitor for not helping her country. Javhlan was terrified that she would not survive. Eventually, Javhlan was released from custody without any explanation. As Javhlan was leaving the prison, the agents warned her that she was fortunate this time, but that she would not come out alive next time. Javhlan continued to receive phone calls and in-person threats from Secret Police agents after this unexplained detention. Javhlan was stopped by Secret Police agents on the street and interrogated about why she was not cooperating with the Secret Police. Javhlan was warned that her family would face serious consequences if she did not cooperate with the Secret Police.

From 1996 to 2000, the People's Democratic Party was in power in the government and the Secret Police called Javhlan less frequently. But when the Mongolian Communist Party regained power in 2000, Javhlan testified that the threats from the Secret Police agents "became more powerful." At this time, Javhlan was working for the UNDP and the Secret Police agents wanted her to provide information about United Nations representatives. Captain Ganbold threatened to tell Javhlan's supervisors at the UNDP that she was a prostitute and a spy. Javhlan was very afraid that Captain Ganbold would carry out these threats and, even worse, that she would be arrested and jailed again. Javhlan was accosted by Secret Police agents in the streets, who threatened Javhlan with assault, imprisonment, torture, rape, and death. Javhlan began to change her work habits, hoping that she would escape these continuing threats and harassment from Secret Police agents. As a result of these constant threats and harassment, Javhlan contemplated suicide.[2]

Javhlan suffered mentally and physically as a result of the Secret Police harassment and threats. In September 2001, Javhlan developed a paralysis on the left part of her face because of the stress of the threats and thinking about what would happen to her as a result of her refusal to cooperate. In May 2002, Javhlan's husband was suddenly fired from his job at the Water Supply Economy Company without explanation.

---

[2]The dissent claims that Javhlan later corrected her testimony that she contemplated suicide, but this is not true from the record. Dissent at 19295-96. Javhlan stated at her hearing, "They were threatening me a lot and so I had a lot of physical and emotional pressure, and at the same time, my family and children also had a lot of pressure. So, sometimes, I wanted to finish my life, but I had my elderly mom, and so I wanted to be alive for her. And so I had a lot of threatenings about being raped and assaulted." The IJ then told Javhlan that this wasn't "going to work. [You] need to use smaller phrases[.]" The IJ then instructed the translator to translate in smaller phrases. Javhlan continued with her testimony, and did not state that her earlier testimony was incorrect. No one challenged the *accuracy* of the translation.

This followed a phone call Javhlan received from the Secret Police warning her that after she had refused for so many years to do her "duty" for her country, "it was time for [her] country to 'deal' with [her]." She was also told during this same conversation that the next time she was arrested she would be raped. Javhlan and her husband decided to flee Mongolia because they believed this was the only way to avoid harm.

After Javhlan and her husband left the country, the Secret Police contacted Javhlan's mother and brother demanding to know Javhlan and her husband's new location. When Javhlan's mother and brother refused to provide the requested information, the Secret Police threatened that they would be punished. On December 20, 2002, Javhlan's brother's car was firebombed *one* day after the Secret Police visited him demanding to know Javhlan's whereabouts.

Javhlan submitted to the IJ an affidavit from a native Mongolian, Gonchigdamba Bayarsaikhan ("Bayarsaikhan"), who suffered constants threats and survived an assassination attempt when his car exploded after he refused to act as a spy for the communist Secret Police at the foreign embassies where he worked. Bayarsaikhan stated in his affidavit that the Mongolian Secret Police are "capable of visiting untold acts of horror and devastation on its targets . . . ." The IJ did not question the credibility of Bayarsaikhan's affidavit.

Although the IJ did not question Javhlan's credibility, the IJ denied Javhlan's applications for asylum, withholding of removal, and CAT protection because the IJ concluded that Javhlan had not suffered past persecution and had not established that she had a well-founded fear of persecution if she were to return to Mongolia. The IJ concluded that Javhlan's subjective fear of returning to Mongolia was genuine, but that "there is no objectively reasonable basis" for a fear of future persecution. The IJ cited no cases to support her legal conclu-

sions, nor did the BIA. The BIA affirmed without opinion.
We disagree.

A reasonable factfinder would have to conclude that Javh-
lan suffered past persecution on account of her political opin-
ion. The evidence demonstrates that Javhlan suffered multiple
in-person confrontations with communist Secret Police
agents, and that she was frequently threatened over a period
of years with assault, imprisonment, rape, and death because
she refused to act as a spy for them. The threats by the Secret
Police, and the mental anguish and physical paralysis that
Javhlan suffered as a result, constitute persecution. We find
that the cumulative effect of these events qualifies as an
offensive suffering or harm that rises to the level of persecu-
tion.

**[1]** We have held that threats of serious harm may consti-
tute persecution. *Mashiri v. Ashcroft*, 383 F.3d 1112, 1120-21
(9th Cir. 2004), *amended by* 2004 U.S. App. LEXIS 22712
(9th Cir. 2004). Although we have found that unfulfilled
threats alone generally do not rise to the level of persecution,
*see Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003),
we have held that ongoing threats, harassment, and close con-
frontations amount to persecution. *See Thomas v. Ashcroft*,
359 F.3d 1169, 1179 (9th Cir. 2004) ("Threats of violence and
death are enough to constitute persecution.") (internal quota-
tion marks and citation omitted); *Ruano v. Ashcroft*, 301 F.3d
1155, 1160-61 (9th Cir. 2002) (finding persecution where the
asylum applicant received multiple death threats over a period
of six years and had "near face-to-face confrontations" with
his persecutors); *Sangha v. INS*, 103 F.3d 1482, 1487-88 (9th
Cir. 1997) (holding that recruitment attempts and death
threats "are sufficient to show persecution").

**[2]** In determining whether multiple threats and incidents
of harassment constitute persecution, we view them cumula-
tively. *Mashiri*, 383 F.3d at 1120-21; *Surita v. INS*, 95 F.3d
814, 819 (9th Cir. 1996). "[T]he severity of harm is com-

pounded when incidents of persecution have occurred on more than one occasion, particularly where an applicant is victimized at different times over a period of years." *Baballah v. Ashcroft*, 367 F.3d 1067, 1076 (9th Cir. 2004) (internal quotation, citation, and ellipsis omitted); *see also Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1075 (9th Cir. 2004) (finding it improper for the IJ to treat the petitioner's personal experiences "as if they had occurred in a vacuum," even though the petitioner's personal experiences of persecution occurred a decade apart). Here, Javhlan's four-to-five hour detention may not by itself amount to persecution. Because reasonable minds could differ on whether this single incident constitutes persecution, the record does not compel a finding that it does. The IJ, however, erred by viewing this incident in isolation, holding that "the only incident. . . [Javhlan] encountered was in 1995 when she was briefly held for four or five hours." This unexplained detention is not the only mistreatment Javhlan suffered; she was threatened numerous times and over a period of years with assault, imprisonment, rape, and death, threats that escalated in severity over time. Thus, the IJ erred in relying *only* on this detention to find that there was no past persecution, particularly in light of the frequent harassment and serious threats the Secret Police agents made to Javhlan's life and safety.

**[3]** We have also held that persecution need not be physical. *See, e.g., Kovac v. INS*, 407 F.2d 102, 105-07 (9th Cir. 1969) (explaining that persecution requires harm or suffering, not necessarily physical harm); *Kahssai v. INS,* 16 F.3d 323, 329 (9th Cir. 1994) (per curiam) (Reinhardt, J., concurring) ("The fact that [petitioner] did not suffer physical harm is not determinative of her claim of persecution; there are other equally serious forms of injury that result from persecution."); *Mashiri*, 383 F.3d at 1120 ("Persecution may be emotional or psychological as well as physical."); *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir. 2004) (stating that persecution may come in the form of threats, harassment, or mental, emotional, and psychological harm); *Khup v. Ashcroft*, 376 F.3d

898, 904 (9th Cir. 2004) (finding threats, combined with anguish suffered as a result of the killing of a fellow Burmese preacher, to constitute persecution). In this case, Javhlan received many threats to her own life and suffered mental anguish as a result. Javhlan contemplated suicide and suffered a nervous breakdown. This mental stress led to a partial stroke in the left part of her face, which occurred about a year before she fled Mongolia. The cumulative effect of the constant threats by the Secret Police combined with the mental anguish and physical paralysis that Javhlan suffered as a result constitute persecution. Thus, Javhlan's credible testimony and corroborating evidence compel a finding of past persecution.

**[4]** "Either past persecution or a well-founded fear of future persecution provides eligibility for a discretionary grant of asylum." *Ratnam v. INS*, 154 F.3d 990, 994 (9th Cir. 1998). Javhlan has demonstrated her eligibility for asylum under both of these standards.

**[5]** First, because Javhlan suffered past persecution, there is a rebuttable presumption that she has a well-founded fear of future persecution, and the burden shifts to the government to demonstrate "by a preponderance of the evidence" that there has been a fundamental change in circumstances such that she no longer has a well-founded fear. 8 C.F.R. § 1208.13(b)(1); *see also Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004) (internal quotation marks omitted). Here, the government did not make any argument before the IJ or the BIA concerning changed country conditions, nor did the government present any evidence, including documentary evidence, for that purpose. We decline to grant the government another opportunity to do so. *See Baballah*, 367 F.3d at 1078 n.11. ("In these circumstances, to provide the INS with another opportunity to present evidence of changed country conditions, when it twice had the chance, but failed to do so, would be exceptionally unfair."). Thus, Javhlan has established her eligibility for asylum based on past persecution.

**[6]** Second, Javhlan has also established her eligibility for asylum based on a well-founded fear of future persecution. To establish a well-founded fear of persecution, Javhlan needed to demonstrate she subjectively fears persecution and that her fear is objectively reasonable. *Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007). Because Javhlan testified credibly that she genuinely fears harm, the subjective prong of the well-founded fear test is satisfied. *Id.* Further, there is substantial evidence that Javhlan has an objectively reasonable well-founded fear of future persecution. The substantial evidence includes: the threats made to Javhlan's life and safety by the Secret Police before she fled Mongolia; the affidavit submitted by another Mongolian native, whose veracity the IJ never questioned, who was personally threatened and survived an assassination attempt because of his refusal to spy for the Mongolian Secret Police; the continued questioning of Javhlan's mother and brother by Secret Police agents about Javhlan's whereabouts after her departure; the threats Secret Police agents made against her mother and brother when they refused to tell the Secret Police agents Javhlan's whereabouts; and the bombing that blew up and destroyed Javhlan's brother's car *one day* after her brother refused to tell the Secret Police Javhlan's whereabouts.[3] This evidence clearly shows at

---

[3]The IJ's conclusion that there is "no evidence at all other than the respondent's own speculative belief that the car burning was in any way related to her" is not supported by substantial evidence. Javhlan's brother's car was firebombed the day after he received a visit from the Secret Police asking about Javhlan's whereabouts. Because the IJ did not make an adverse credibility finding, these facts are accepted as true. A reasonable fact finder would have to conclude that the car bombing was related to Javhlan — it occurred *one day after* her brother was visited by the Secret Police demanding to know Javhlan's location and threatening her brother for his refusal to tell them. The most logical conclusion from this evidence is that the car bomb was related to the visit by the Secret Police. *See, e.g.*, *Deloso v. Ashcroft*, 393 F.3d 858, 865-66 (9th Cir. 2005) (concluding that the timing of events contributed to the conclusion that petitioner was persecuted at least in part on account of his political opinion). Thus, the assassination attempt on Javhlan's brother was an extension of

least a "one-in-ten chance" of future persecution sufficient to establish a well-founded fear. *Canales-Vargas v. Gonzales*, 441 F.3d 739, 745 (9th Cir. 2006); *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001). Therefore, we conclude that Javhlan is statutorily eligible for asylum.

**[7]** "To qualify for withholding of removal [under 8 U.S.C. § 1231(b)(3)], an alien must demonstrate that it is more likely than not that he would be subject to persecution on one of the specified grounds." *Al Harbi*, 242 F.3d at 888 (internal quotation marks omitted); 8 C.F.R. § 1208.16(b)(2). Past persecution, however, also generates a presumption of eligibility for withholding of removal. *See* 8 C.F.R. § 1208.16(b)(1)(i); *Mousa v. Mukasey*, 530 F.3d 1025, 1030 (9th Cir. 2008); *Reyes-Guerrero v. INS*, 192 F.3d 1241, 1246 (9th Cir. 1999). Because the government has not rebutted the presumption of a well-founded fear of future persecution, Javhlan is also entitled to withholding of removal under 8 U.S.C. § 1231(b)(3).

To qualify for protection under the CAT, Javhlan must "establish that it is more likely than not [ ] she would be tortured if removed to [Mongolia]." *Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001) (quoting 8 C.F.R. § 208.16(c)(2)). The IJ denied Javhlan CAT protection because she found that Javhlan failed to meet the lower standard for asylum and therefore necessarily failed to meet the heightened standard of a clear probability of torture. Because we conclude that the IJ erred in finding that Javhlan did not meet the standard for asylum, we remand to the BIA to determine whether Javhlan satisfies the standard for CAT protection. *See INS v. Ventura*,

---

the threats made against her and demonstrates the reasonableness of her fear that the threats would actually be carried out. *See Baballah*, 367 F.3d at 1074-75 ("Violence directed against an applicant's family members provides support for a claim of persecution and in some instances is sufficient to establish persecution because such evidence may well show that [an applicant's] fear . . . of persecution is well founded.") (internal quotation marks omitted).

537 U.S. 12, 16 (2002); *see also Mohammed v. Gonzales*, 400 F.3d 785, 802 (9th Cir. 2005) ("[U]nlike in the case of asylum and withholding, the showing of past torture does not give rise to a regulatory presumption of fear of future torture) (citing 8 C.F.R. § 1208.16(c)(3)).

**[8]** We therefore conclude that Javhlan suffered past persecution and that she has shown a genuine and well-founded fear of future persecution should she return to Mongolia. Under these circumstances, Javhlan is eligible for asylum. We also conclude that Javhlan is entitled to withholding of removal. We remand this case to the BIA for the Attorney General to exercise his discretion under 8 U.S.C. § 1158(b) as to whether to grant Javhlan asylum, and for an appropriate order withholding removal of Javhlan. We also remand to the BIA for consideration of whether Javhlan is entitled to withholding of removal under CAT.

Petition **GRANTED; REMANDED** for further proceedings.

---

IKUTA, Circuit Judge, dissenting:

The majority confidently takes over the IJ's fact-finding role, combing the record to support its determination that Javhlan suffered past persecution. But Congress and the Supreme Court have rejected the majority's approach. By statute, the agency's "administrative findings of fact are conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (emphasis added). Said otherwise, "[t]o reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it . . . ." *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). Because the agency's determination here is supported by substantial evidence, I respectfully dissent.

A

The IJ's conclusion that Javhlan has not suffered past persecution is well supported by the record. We have defined "persecution" as "an extreme concept," *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995) (quoting *Fisher v. INS*, 37 F.3d 1371, 1380 (9th Cir. 1994)) (internal quotation marks omitted), involving "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive," *Desir v. Ilchert*, 840 F.2d 723, 727 (9th Cir. 1988) (quoting *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969)) (internal quotation marks omitted). But not "every sort of treatment our society regards as offensive" rises to the level of persecution. *Ghaly*, 58 F.3d at 1431 (quoting *Fisher*, 37 F.3d at 1380) (internal quotation marks omitted). Here, the record establishes that Javhlan was never touched, and she and her husband were able to work for two decades in embassies without interference.

Based on Javhlan's testimony, the threats she experienced over a twenty-year period lacked detail or specificity, and were unaccompanied by any violent acts. Beginning some time in 1982, Jahvlan was contacted by secret police agents in her native Mongolia who attempted to recruit her to be a spy, and threatened her for not agreeing to do so. As she put it, the secret police first called her "while I been working at the embassy of India. I worked there for about ten years, and they . . . [attempted to] persuade[ ] me to be the member of the Mongolian People's Revolutionary Party and to become their ears and their eyes." She declined. Years later, when she went to work for the United Nations, "the secret police started calling me and they suggested me to meet with them, and also they threatened me. And so I had to delay my stay at work until sometimes midnight, and I had to call my husband to come and pick me up."

According to Javhlan, her refusal to become the secret police's "eyes and ears" led to them "threatening me a lot and

so I had a lot of physical and emotional pressure, and at the same time, my family and children also had a lot of pressures. . . . I had a lot of threatenings about being raped and assaulted." Before the Communists lost power, she reported that the secret police told her "we have the power to arrest you and we will show you that there's not a life of prison. We can do anything. We can rape you. We will show you what misery is all about." The threatening phone calls ceased when the Communists lost power. In 2001, when the Communists regained power, she reported they began calling again and "the threats became more powerful," specifically "they threatened that my husband will lose his job." They also told her "we're going to put you in a prison and we'll show you what the prison life is all about."

Javhlan describes only one significant confrontation during the twenty-year period at issue: Some time in 1995 she was detained for four or five hours by a "Captain Ganbold," who yelled at her and called her a traitor but did not touch her. The two other incidents identified by Javhlan as part of the alleged persecution—namely, her husband's loss of a job and the fire-bombing of her brother's car—are not connected to government persecution by any evidence; rather, Javhlan merely requested that the IJ infer such a connection. The IJ declined to do so, and instead concluded that nothing but "mere speculation" connected Javhlan's refusal to spy to her husband's job loss and that "there is no evidence at all other than [Javhlan's] own subjective belief that the car burning incident was in any way related to her."

The IJ's skepticism is supported by the country report for Mongolia, which, as the IJ explained, "indicate[s] that the government continues in a transition away from communism into a full-fledged multi-party system and that the government generally respects the rights of the citizens." *See Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir. 1995) (observing that the State Department's Country Report on Human Rights Practices has been described as "the most appropriate and perhaps

the best resource for information on political situations in for-
eign nations") (quoting *Rojas v. INS*, 937 F.2d 186, 190 n.1
(5th Cir. 1991)) (internal quotation marks omitted).

B

This evidence is more than enough to support the IJ's con-
clusion. Neither the secret police nor anyone else ever acted
on the vague, nonspecific threats reported by Javhlan. As the
IJ noted, Javhlan and her extended family in Mongolia lived
quite normal lives. In fact, what Javhlan reported are the quin-
tessential empty threats which we have held do not amount to
persecution. Threats alone, we have said, "are sometimes hol-
low and, while uniformly unpleasant, often do not effect sig-
nificant actual suffering or harm." *Lim v. INS*, 224 F.3d 929,
936 (9th Cir. 2000). Moreover, "claims of threats are hard to
disprove." *Id.* Thus, threats alone are almost never sufficient
to prove past persecution except in certain rare situations
when they are specific, serious, and frequent. *See Mashiri v.
Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004) (noting that in
most of the cases where this court has found past persecution
based primarily on unfulfilled threats, the threats were "ac-
companied by evidence of violent confrontations, near-
confrontations and vandalism").

The IJ's conclusion is therefore fully consistent with the
Supreme Court's cases and our own. In *Elias-Zacarias*, the
Court held that neither pressure from terrorist guerillas to join
their movement nor fear of retaliation for not joining
amounted to past persecution. 502 U.S. at 483 & n.2. Simi-
larly, an alien could not establish past persecution when he
stated that he "was harassed and threatened by the federal
police" but "could not remember the dates on which this
harassment occurred," even though he, like Javhlan, was also
"interrogated several times at [his] home and sometimes . . .
would get taken to a desolate place and . . . questioned with
rudeness." *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168,
1171-72 (9th Cir. 2006). And in *Lim*, this court reasoned that

the fact that "[n]either Lim nor his family was ever touched, robbed, imprisoned, forcibly recruited, detained, interrogated, trespassed upon, or even closely confronted" and that he was able to carry on for "six years without harm and without fleeing" supported the BIA's conclusion that the threats did not "inflict sufficient 'suffering or harm' to compel a finding of past persecution." 224 F.3d at 936. This was true despite a good deal of evidence that Lim was in danger: namely, his appearance on a paramilitary "death list," threatening phone calls, threatening letters tied with a black ribbon (which signified a death threat in the local culture), and the presence of unidentified men following him shortly after the murders (one by one) of three of his former colleagues. *Id.* at 932-33.

Nor are the facts here comparable to those cases where we overturned the IJ's determination. Javhlan did not encounter the level of violence that we held constituted past persecution in *Ruano v. Ashcroft*, 301 F.3d 1155, 1157 (9th Cir. 2002). In that case, an alien received "multiple death threats at [his] home and place of business" over a "period of six years" and endured "near face-to-face confrontations" with his persecutors, including "[being] followed by and narrowly escap[ing] four armed men trying to kill [him]." *Id.* at 1157, 1160-61. The threats against Javhlan were nowhere near as specific as in *Ruano*: one of the thirty or thirty-five death threats mailed to Ruano read, "We've been observing that you are involved with the shit of a queer party as is UCN, we're giving you a time limit of 15 days so you get the hell out of here, you son of a bitch . . . if you don't leave we'll kill you right away." *Id.* at 1157-58 (alteration in original). Nor did Javhlan encounter the sort of persistent and focused pressure that we held constituted past persecution in *Reyes-Guerrero v. INS*, 192 F.3d 1241 (9th Cir. 1999). In that case a Colombian attorney employed by the Ministry of Justice to investigate an embezzlement by high-ranking Liberal Party politicians received death threats over the phone and in person warning him against pursuing the investigation. *Id.* at 1243. Although the alien "requested and was provided protection by the

national security agency," *id.* at 1243, and "changed vehicles, residences, offices, and phone numbers," the persecutors always managed to find him, *id.* at 1244.

C

Although substantial evidence supports the IJ's conclusion, the majority characterizes the facts and resolves ambiguous evidence in a way that favors the majority's view that Javhlan suffered past persecution. For example, where the IJ noted the non-violent contacts and empty threats described by Javhlan, the majority describes the same incidents in language which is more dramatic than Javhlan uses herself. Whereas the majority writes, "Javhlan was accosted by Secret Police agents in the streets, who threatened Javhlan with assault, imprisonment, torture, rape, and death," Maj. Op. at 19283, Javhlan herself said, "During this period, I was accosted on several occasions by agents in the street and this pattern continued for the two years immediately preceding my leaving the country." The majority places weight on irrelevant facts that went unnoticed by the IJ, such as Javhlan's childhood experiences and stories told her by her grandparents. Maj. Op. at 19282. The majority stresses Javhlan's claims of "mental anguish and physical paralysis," while the IJ noted merely that Javhlan "claims to have developed a facial disorder because of nervousness." The majority claims that "[a]s a result of these constant threats and harassment, Javhlan contemplated suicide," but the only evidence supporting the majority's claim is a statement made by Javhlan immediately before the IJ and interpreter stopped her testimony due to problems with the translation process, and which she subsequently corrected.[1] Where the IJ concluded that "there is no

___

[1]Before the IJ stopped the interpreter because the process was not "going to work," Javhlan's statement was interpreted as "So, sometimes, I wanted to finish with my life, but I had my elderly mom, and so I wanted to be alive for her," but when Javhlan started up again, she testified that "as I mentioned earlier, I could overcome all the threats to my life when they wanted to finish with my life."

evidence at all other than [Javhlan's] own subjective belief that the car burning incident was in any way related to her," the majority resolves the facts a different way, and finds that the "most logical conclusion . . . is that the car bomb was related to the visit by the Secret Police." Maj. Op. at 19288 n.3. Finally, given the lack of any threats against Javhlan rising to the level of persecution, the majority points to an affidavit from a completely unrelated Mongolian, Gonchigdamba Bayarsaikhan. Maj. Op. at 19284.

The evidence cited by the majority might have been enough to support the IJ's determination that Javhlan had suffered past persecution, had the IJ reached that conclusion. But the existence of substantial evidence supporting the *majority's* conclusion is in no way inconsistent with the existence of substantial evidence supporting the *IJ's*, and our job is limited to determining whether the findings the IJ actually made were supported by substantial evidence in the record.

D

Because we have upheld BIA decisions that aliens failed to carry their burden of proving past persecution based on evidence of far more harmful interactions than Javhlan's reports of empty threats and a single unpleasant detention, it is clear that the agency's decision here was supported by substantial evidence. The majority fails to point to any evidence "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 483-84. I respectfully dissent.