NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| NEXIS DAVID BELLORIN UMANZOR, | No. 20-70279 |
| Petitioner, | Agency No. A216-574-808 |
| v. | |
| MERRICK B. GARLAND, Attorney General, | MEMORANDUM[*] |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 14, 2021
Pasadena, California

Before: PAEZ and VANDYKE, Circuit Judges, and KORMAN,[**] District Judge.
Concurrence by Judge KORMAN

Nexis David Bellorin Umanzor, a native and citizen of Nicaragua, petitions

for review of a decision by the Board of Immigration Appeals (BIA) affirming the

Immigration Judge's (IJ) denial of his applications for asylum, withholding of

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

removal, and protection under the Convention Against Torture (CAT). We have jurisdiction under 8 U.S.C. § 1252,[1] and we deny the petition for review.

Where the BIA "affirmed the results of the decision below pursuant to 8 C.F.R. § 1003.1(e)(4) …. [w]e review the IJ's decision as the final agency determination." *Singh v. Gonzales*, 403 F.3d 1081, 1083 (9th Cir. 2005) (quotation marks omitted). "We review factual findings for substantial evidence and legal questions de novo." *Guerra v. Barr*, 974 F.3d 909, 911 (9th Cir. 2020).

1.     Bellorin Umanzor challenges the IJ's conclusion that he failed to demonstrate past persecution and a well-founded fear of future persecution for purposes of his asylum claim. "In order to establish eligibility for asylum on the basis of past persecution, an applicant must show … an incident, or incidents, that rise to the level of persecution …." *Navas v. INS*, 217 F.3d 646, 655 (9th Cir. 2000).

Bellorin Umanzor argues that the threats he received were sufficient by themselves to establish past persecution. The record, however, does not compel the conclusion that these threats make this case one of the "small category of cases [where] … the threats are so menacing as to cause significant actual suffering or harm" sufficient to constitute past persecution. *Marcos v. Gonzales*, 410 F.3d 1112, 1119 (9th Cir. 2005) (citation and quotation marks omitted).

---

[1] Because the parties are familiar with the facts and procedural history of the case, we recite only those facts necessary to decide the appeal.

2

Bellorin Umanzor also contends that his case is analogous to *Ruano v. Ashcroft*, 301 F.3d 1155 (9th Cir. 2002), and thus the harassment he experienced, cumulatively considered, constitutes past persecution. When compared to the facts in *Ruano*, 301 F.3d at 1157, 1158, 1160 (where petitioner received between thirty and thirty-five individualized death threats at home and work, was driven to quit his job, and was repeatedly chased by the same armed men over the span of four years), the record here does not compel the conclusion that the cumulative effect of Bellorin Umanzor's mistreatment is sufficient to establish past persecution. Accordingly, the record does not compel the conclusion that Bellorin Umanzor suffered past persecution.

Bellorin Umanzor further argues that the country conditions evidence in the record, together with his testimony, demonstrate he has an objectively reasonable fear of future persecution and that the country conditions evidence established a "pattern or practice" of persecution against similarly situated individuals. But Bellorin Umanzor focuses on country conditions evidence from a time period preceding the country conditions relevant to the IJ's decision. As a result, that evidence does not undermine the IJ's conclusion that there was insufficient evidence to show the Nicaraguan government was *still* rounding up members of the political opposition at the time of the hearing. Additionally, the IJ correctly observed that there is no record evidence that any of the 30 other individuals who participated in

the same work stoppage protest as Bellorin Umanzor have faced mistreatment or threats. The record evidence does not compel the conclusion that he has a well-founded fear of future persecution. Thus, substantial evidence supports the IJ's denial of Bellorin Umanzor's asylum claim.

**2.** Bellorin Umanzor argues that he is eligible for withholding of removal. But "[a]n applicant who fails to satisfy the lower standard for asylum necessarily fails to satisfy the more demanding standard for withholding of removal, which involves showing by a 'clear probability' that the petitioner's life or freedom would be threatened in the proposed country of removal." *Davila v. Barr*, 968 F.3d 1136, 1142 (9th Cir. 2020) (citation omitted).

**3.** Bellorin Umanzor contends that the IJ failed to consider relevant country conditions evidence in concluding that Bellorin Umanzor was not eligible for CAT relief generally, and specifically with respect to the IJ's finding regarding his ability to relocate internally. But Bellorin Umanzor relies on country conditions evidence from a time frame earlier than that which was relevant to the IJ's analysis and fails to point to record evidence compelling the conclusion that he would "'more likely than not' … be tortured" based on the conditions in Nicaragua around the relevant time of the IJ's decision. *Wakkary v. Holder*, 558 F.3d 1049, 1053 (9th Cir. 2009) (citation omitted). The IJ's conclusion that Bellorin Umanzor is not eligible for CAT relief is supported by substantial evidence.

The petition for review is **DENIED**.

*Bellorin Umanzor v. Garland*, No. 20-70279

Korman, *D.J.*, concurring.

I write separately to express my concern that deporting petitioner would be a grave injustice with potentially serious consequences. Bellorin Umanzor was a 27-year-old protester fleeing deadly political repression in Nicaragua inflicted by a ruthless authoritarian regime bent on silencing any whisper of political dissent. Paramilitary forces retaliated against Bellorin Umanzor for his participation in protests against this regime. Armed men menaced his family, deployed smoke bombs against them, and in one instance attempted to force Bellorin Umanzor off the road.

The hostility that Bellorin Umanzor faced did not occur in a vacuum. The Nicaraguan government has engaged in "extrajudicial killings; enforced disappearances; obstructions to access to medical care; widespread arbitrary or illegal detentions; prevalent ill-treatment and instances of torture and sexual violence in detention cent[ers]; violations of freedoms of peaceful assembly and expression, including the criminalization of social leaders, human rights defenders, journalists and protesters considered critical of the Government." Certified Admin. Record ("CAR") 320 (Office of the U.N. High Comm'r for Human Rights, Human Rights Violations and Abuses in the Context of Protests in Nicaragua). The government

1

deployed national police and parapolice forces to shoot "high-caliber weapons from concealed, elevated and distant locations at protesters," and forensic investigations "suggested [that] the shooters specifically aimed to kill." *Id.* at 281 (U.S. State Dep't, Nicaragua 2018 Human Rights Report). Indeed, "[t]here were credible reports [that] the government killed some *police officers* for refusing to follow orders to suppress protests." *Id.* at 282 (emphasis added).

This is a country where an unknown number of people have vanished into the hands of the state or its accomplices. CAR 340. A country where families often learn of the deaths of their missing loved ones from an invitation to identify their bodies at a morgue administered by the very government that murdered them. *Id.* Tragically, those families may have been the lucky ones—others found the corpses of their family members "strewn about city streets." *Id.* at 282. The government inflicted these abuses intentionally and systematically, adopting a "policy of 'exile, jail, or death'" for anyone perceived as a political opponent of the "highly centralized, authoritarian political system" dominated by President Daniel Ortega and the Sandinista party. *Id.* at 280.

Although Bellorin Umanzor escaped Nicaragua—at least temporarily—the sickening conduct of the regime has continued unabated. The State Department country conditions report for 2019 had not been issued by the time the BIA ruled on Bellorin Umanzor's asylum claim, but that document found continued human rights

2

abuses, including "extrajudicial killings . . . ; forced disappearance[s] by parapolice forces; . . . and arbitrary detentions by police and parapolice." The report for 2020, released earlier this year, found that "[p]arapolice and individuals linked to the Ortega regime carried out a campaign of harassment, intimidation, and violence toward perceived enemies of the regime" like Bellorin Umanzor. Both reports found that Ortega failed to take any serious steps "to identify, prosecute, or punish officials who committed human rights abuses, including those responsible for at least 325 killings and hundreds of disappearances during the prodemocracy uprising of April 2018," and has instead "actively strengthened impunity for human rights abusers who were loyal to him." Although the agency did not consider these reports because they had not yet been released by the time of decision, they provide strong evidence that Nicaragua is no safer today for those who have strayed from the Sandinista line than it was when Bellorin Umanzor fled.

While the demanding standard of review determines the outcome we reach in this very close case, the Attorney General's discretion is not so constrained. Indeed, U.S. Immigration and Customs Enforcement recently issued interim guidance on the Administration's enforcement and removal policies to reflect the "baseline values and priorities" set forth by the President. Interim Guidance: Civil Immigration Enforcement and Removal Priorities 1 (Feb. 18, 2021), https://www.ice.gov/doclib/news/releases/2021/021821_civil-immigration-

enforcement_interim-guidance.pdf.  It is hard to see what value would justify treating Bellorin Umanzor—an asylum seeker who poses no threat to national security, border security, or public safety—as a priority for removal.

Although Bellorin Umanzor failed to assemble a record compelling the conclusion that he is eligible for asylum, the Attorney General is not required to ignore the possibility that removing him to Nicaragua may bring him to harm.  As the Attorney General wrote in his prior position as a federal judge, "'[t]here comes a point where . . . Court[s] should not be ignorant as judges of what [they] know as men' and women."  *ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013) (Garland, *C.J.*) (quoting *Watts v. Indiana*, 338 U.S. 49, 52 (1949) (Frankfurter, *J.*)).  If this is true for a federal judge, then so much more for the Attorney General of the United States.

Bellorin Umanzor's failure to establish eligibility for relief does not demonstrate that returning him to a country where he may be in danger is the prudent public policy choice, nor the good or moral one.  Those choices, however, are for others to make.  We may be "unable to grant [Bellorin Umanzor] relief," but the Court is "not obligated to become a silent accomplice to what may be an injustice."  *Friedman v. Rehal*, 618 F.3d 142, 161 (2d Cir. 2010).